**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| In re | x |
| | : |
| WHITE STAR PETROLEUM HOLDINGS, LLC, | :    Chapter 11 |
| *et al.*,[1] | : |
| | :    Case No. 19-12521-JDL |
| | : |
| Debtors. | :    Jointly Administered |
| | x |

**DISCLOSURE STATEMENT FOR DEBTORS' JOINT CHAPTER 11
PLAN OF LIQUIDATION OF WHITE STAR PETROLEUM
HOLDINGS, LLC AND ITS DEBTOR AFFILIATES**

Andrew G. Dietderich
Brian D. Glueckstein
Alexa J. Kranzley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone:   (212) 558-4000

Counsel to the Debtors and Debtors-in-Possession

Dated:  January 6, 2020

---

[1]   The Debtors in these chapter 11 cases, and the last four digits of their U.S. taxpayer identification numbers are: White Star Petroleum Holdings, LLC (0575) ("WSTR Holdings"), White Star Petroleum, LLC (0977) ("WSTR"), White Star Petroleum II, LLC (4347) ("WSTR II"), White Star Petroleum Operating, LLC (5387) ("WSTR Operating") and WSP Finance Corporation (9152) ("WSP Finance" and together with WSTR Holdings, WSTR, WSTR II and WSTR Operating, the "Debtors").  The Debtors' corporate headquarters is located at 301 N.W. 63rd Street, Suite 600, Oklahoma City, OK 73116.

THE BOARD OF MANAGERS (OR THE EQUIVALENT AUTHORIZED BODY) OF EACH OF THE DEBTORS HAS APPROVED THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN AND THE TRANSACTIONS CONTEMPLATED AND DESCRIBED HEREIN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE CHAPTER 11 PLAN IT DESCRIBES HEREIN.  NO PERSON SHOULD USE OR RELY ON THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT IS BEING DISTRIBUTED TO PARTIES-IN-INTEREST AS A SETTLEMENT PROPOSAL AND IS THEREFORE SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND OTHER APPLICABLE RULES, AND DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER IN CONNECTION WITH ANY PENDING, THREATENED AND POTENTIAL LITIGATION, ARBITRATIONS OR DISPUTES.

IF THE BANKRUPTCY COURT DOES NOT CONFIRM THE CHAPTER 11 PLAN AND/OR THE CHAPTER 11 PLAN DOES NOT BECOME EFFECTIVE, NO PORTION OF THE CHAPTER 11 PLAN, INCLUDING ANY SETTLEMENTS, WILL BECOME EFFECTIVE.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND DOCUMENTS RELATED THERETO; STATUTORY PROVISIONS RELEVANT TO CONFIRMATION OF THE PLAN; EVENTS IN THESE CHAPTER 11 CASES AND FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE SUCH SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRETY OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.

FACTUAL INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT OF THE DEBTORS, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.

NO PERSON SHOULD RELY ON ANY OTHER INFORMATION THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED BY REFERENCE HEREIN.  THE DEBTORS HAVE NOT AUTHORIZED

ANYONE TO PROVIDE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.

# TABLE OF CONTENTS

1.    EXECUTIVE SUMMARY ..................................................................................1

    A.    Purpose of this Disclosure Statement .....................................................1
    B.    Recovery Analysis and Treatment of Claims and Equity Interests .........2
    C.    Deemed Substantive Consolidation of the Debtors ................................4
    D.    Voting on the Plan ...................................................................................5
    E.    Confirmation of the Plan ..........................................................................7

2.    BACKGROUND ............................................................................................7

    A.    Debtors, Transactions with Affiliates and Directors and Officers...........7
    B.    Operations .............................................................................................10
    C.    Financial Performance and Cash Position .............................................12
    D.    Prepetition Capital Structure.................................................................12
    E.    Events Leading to the Commencement of the Debtors' Chapter 11 Cases ..........14

3.    SIGNIFICANT EVENTS AND INITIATIVES IN THESE CHAPTER 11 CASES........19

    A.    Overview of Chapter 11 .........................................................................19
    B.    The Commencement of the Voluntary Cases and the Involuntary Case ..............19
    C.    The Chapter 11 Cases ...........................................................................20
    D.    Sale Process ..........................................................................................25
    E.    M&M Liens .............................................................................................28
    F.    Committee's Investigation and Litigation ..............................................32

4.    SUMMARY OF THE PLAN ...........................................................................34

    A.    Classification, Treatment and Voting of Claims and Equity Interests..................35
    B.    Implementation of the Plan....................................................................38
    C.    Provisions Governing Distributions........................................................43
    D.    Settlement, Release, Injunction and Related Provisions.......................50

5.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN .................54

    A.    The Confirmation Hearing......................................................................54
    B.    Confirmation Standards .........................................................................55
    C.    Best Interests Test .................................................................................56
    D.    Financial Feasibility...............................................................................58
    E.    Acceptance by Impaired Classes ..........................................................58
    F.    Confirmation Without Acceptance by All Impaired Classes...................59

6.    VOTING PROCEDURES ...............................................................................60

    A.    Parties-in-Interest Entitled to Vote ........................................................62
    B.    Voluntary Releases under the Plan ........................................................62
    C.    Classes under the Plan ..........................................................................63

|   | D. | Solicitation Packages for Voting Classes ............................................63 |
|---|----|----|
|   | E. | Solicitation Packages for Non-Voting Classes ....................................64 |
|   | F. | Voting Procedures....................................................................64 |

| 7. | ADDITIONAL FACTORS TO BE CONSIDERED PRIOR TO VOTING ....................65 |
|----|----|

|   | A. | Risks Related to these Chapter 11 Cases ............................................65 |
|---|----|----|
|   | B. | Risks Related to the Plan .....................................................66 |
|   | C. | Additional Risks..................................................................69 |

| 8. | MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............................................................................70 |
|----|----|

|   | A. | Federal Income Tax Consequences to Debtors....................................70 |
|---|----|----|
|   | B. | General Tax Reporting by the Litigation Trust and Litigation Trust Beneficiaries ................................................................72 |

| 9. | ALTERNATIVE TO CONFIRMATION OF THE PLAN .............................73 |
|----|----|

|   | A. | Chapter 7 Liquidation ...........................................................73 |
|---|----|----|

| 10. | DEBTORS' RECOMMENDATION ................................................73 |
|-----|----|

**Appendices**

Appendix A:  Debtors' Plan of Liquidation

Appendix B:  Solicitation Procedures Order

Appendix C:  Liquidation Analysis

1.    **EXECUTIVE SUMMARY**

On May 28, 2019, WSTR Holdings and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") filed with the United States Bankruptcy Court for the District of Delaware (the "Delaware Court") voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") (the "Voluntary Cases").  Prior to the filing of the Voluntary Cases, on May 24, 2019, five creditors filed an involuntary chapter 11 bankruptcy petition against WSTR with the United States Bankruptcy Court for the Western District of Oklahoma (the "Bankruptcy Court" or the *"Oklahoma Court"*) (the "Involuntary Case").  The Voluntary Cases were transferred to the Oklahoma Court on June 20, 2019.  On July 3, 2019, the WSTR Voluntary Case was consolidated into the Involuntary Case.[2]  From the Petition Date through the closing of the sale of substantially all of the Debtors' assets, the Debtors operated in the ordinary course of business.  Since the sale closed on November 1, 2019, the Debtors have been working with their key creditor constituencies on the development of the Plan, the continued orderly disposal of residual assets and the administration of these chapter 11 cases.

Simultaneous with the filing of this Disclosure Statement, the Debtors are filing the *Joint Chapter 11 Plan of Liquidation of White Star Petroleum Holdings, LLC and its Debtor Affiliates* (as may be further amended, supplemented or modified from time to time, including the Plan Supplement and all other exhibits and schedules thereto, in each case, as they may be further amended, modified or supplemented from time to time, the "Plan"),[3] a copy of which is attached hereto as Appendix A.  The Plan and this Disclosure Statement are the result of extensive negotiations among the Debtors, the RBL Agent and the Committee, and have been approved by the Debtors' Board of Managers, the RBL Agent and the Committee.  The Plan settles, among other things, the Committee Adversary Proceeding.

A.    **Purpose of this Disclosure Statement**

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization and orderly liquidations.  Chapter 11 helps a company to maximize recovery to all stakeholders.  The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against, and interests in, the debtors.  Confirmation of a plan by a bankruptcy court binds the debtors and any creditor or interest holder of the debtors.  Subject to certain limited exceptions, the order approving confirmation of a plan enjoins parties from enforcing any debt that arose prior to the date of confirmation of the plan or from bringing any causes of action against the debtors in connection with such debt.

In general, a plan (a) divides claims and interests into separate classes, (b) specifies the property that each class is to receive under the plan and (c) contains provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "interests," rather

---

[2]    "Petition Date" shall mean, for WSTR, May 24, 2019, and for each of the other Debtors, May 28, 2019.

[3]    Capitalized terms not defined herein shall have the meanings given to them in the Plan.

than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and interests in more than one class.

The Debtors submit this *Disclosure Statement for Debtors' Joint Plan of Liquidation of White Star Petroleum Holdings, LLC and its Debtor Affiliates* (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code for the purpose of soliciting votes on the proposed Plan. The purpose of this Disclosure Statement is to provide the Holders of Claims who are entitled, and will be solicited, to vote on the Plan with adequate information to make an informed judgment about the Plan. According to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited only after a Bankruptcy Court approved written disclosure statement has been provided to each creditor or interest holder who is entitled to vote on the plan.

**B.     Recovery Analysis and Treatment of Claims and Equity Interests**

The Plan organizes the Debtors' creditor and equity constituencies into groups called Classes. For each Class, the Plan describes (a) the underlying Claim or Equity Interest, (b) the recovery available to the Holders of Claims or Equity Interests in that Class under the Plan, (c) whether the Class is Impaired under the Plan, meaning that each Holder will receive less than full value on account of its Claim or Equity Interest or that the rights of Holders under law will be altered in some way and (d) the form of any consideration (*e.g.*, Cash, stock or a combination thereof) that Holders will receive on account of their respective Claims or Equity Interests.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify General Administrative Claims or Professional Claims, which will generally be paid in Cash when approved by the Bankruptcy Court or in the ordinary course on or after the Effective Date.

The classification of Claims and Equity Interests pursuant to the Plan is as follows:

| CLASS | CLAIMS AND EQUITY INTERESTS | STATUS | VOTING RIGHTS |
|-------|-----------------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | RBL Secured Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Equity Interests in Holdings | Impaired | Deemed to Reject |

The table below provides a summary of the classification, treatment and estimated recoveries of Claims and Equity Interests under the Plan. This information is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process, and is qualified in its entirety by reference to the provisions of the Plan. For a more detailed description of the treatment of Claims and Equity Interests under the Plan, see Section 4 below—Summary of the Plan.

SC1:5119879.1

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS AND ESTIMATED RECOVERIES[4]**

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[5] | ESTIMATED PERCENT RECOVERY | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| Class 1 Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (a) the Effective Date, (b) the date on which such Other Priority Claim becomes Allowed and (c) such other date as may be ordered by the Bankruptcy Court. | | 100% | |
| Class 2 Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Debtors or, after the Effective Date, the Plan Administrator: (a) payment in full in Cash including the payment of any interest payable under section 506(b) of the Bankruptcy Code; (b) delivery of the collateral securing such Allowed Other Secured Claim or (c) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired. | | 100% | |

---

[4]    Figures are as of January __, 2020, and are subject to material change.

[5]    Estimated aggregate amount of claims currently asserted against or scheduled by the Debtors, incorporating provisions of the Plan and excluding duplicative claims.

3

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[5] | ESTIMATED PERCENT RECOVERY | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| Class 3 RBL Secured Claims | Except to the extent that a Holder of an Allowed RBL Secured Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed RBL Secured Claim, each Holder of an Allowed RBL Secured Claim shall receive its Pro Rata share of the RBL Secured Claim Distribution, until such time as such Holder has received Cash distributions equal to the Allowed amount of such Allowed RBL Secured Claim. | $280,221,539.08 | | |
| Class 4 General Unsecured Claims | Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Unsecured Claim: (i) each Holder of an Allowed General Unsecured Claim, other than a Holder of an RBL Deficiency Claim, shall receive its Pro Rata share of the Unsecured Claim Pool; and (ii) if Litigation Trust Distributable Cash is available for Distribution, each Holder of an Allowed General Unsecured Claim, other than a Holder of an RBL Deficiency Claim, shall receive its Pro Rata share of 50% of Litigation Trust Distributable Cash and each Holder of an RBL Deficiency Claim shall receive its Pro Rata share of 50% of Litigation Trust Distributable Cash. | | | |
| Class 5 Equity Interests in Holdings | No Holder of an Equity Interest in Holdings shall receive any Distributions on account of its Equity Interest.  On and after the Effective Date, all Equity Interests in Holdings shall be canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. | | 0% | |

C.     **Deemed Substantive Consolidation of the Debtors**

        The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including Voting, Confirmation and Distribution. The deemed substantive consolidation of the Debtors' Estates for certain limited purposes is for

4

administrative convenience only, and the Debtors do not contend that substantive consolidation is appropriate under the applicable legal standard.

As explained in Section 2.A below, the Debtors consist of WSTR Holdings and its four subsidiaries. The Debtors are an integrated enterprise, managed across geographic boundaries and legal entities. Holders of Allowed Claims against or Equity Interests in each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims or Equity Interests in the applicable Class. The Debtors believe that no creditor will receive a recovery inferior to that which it would receive if each Debtor proposed a plan of liquidation that was completely separate from that proposed by each other entity and, therefore, the Debtors do not believe that any creditor will be materially adversely affected by not voting and receiving distributions on an entity-by-entity basis.

### D.    Voting on the Plan

#### 1.    *Parties-in-Interest Entitled to Vote*

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan. Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is deemed to have accepted the plan, and the plan proponent need not solicit such holder's vote. Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan. For a detailed description of the treatment of Claims and Equity Interests under the Plan, refer to Section 4 below—Summary of the Plan.

Classes 1 and 2 are Unimpaired under, and deemed under section 1126(f) of the Bankruptcy Code to have accepted, the Plan.

Classes 3 and 4 are Impaired under, and entitled to vote to accept or reject, the Plan.

Class 5 is Impaired under, and deemed under section 1126(g) of the Bankruptcy Code to have rejected, the Plan.

Except as described in Section 5 below, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in such class that have voted to accept or reject the plan. Holders of claims who fail to

SC1:5119879.1

vote are deemed neither to accept nor to reject the plan.  For a more detailed description of the requirements for confirmation of the Plan, refer to Section 5 below—Statutory Requirements for Confirmation of the Plan.

Even if the Plan has not been accepted by all Impaired Classes entitled to vote, section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors. Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan can be confirmed by a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Equity Interests that is Impaired under, and has not accepted, the Plan. For a more detailed description of the requirements for confirmation of a nonconsensual plan, refer to Section 5 below—Statutory Requirements for Confirmation of the Plan.

2.    _Submitting a Ballot_

Classes 3 and 4 are entitled to or are being solicited to vote to accept or reject the Plan.  If you are entitled to or are being solicited to vote, you should carefully review this Disclosure Statement, including the attached appendices and the instructions accompanying your Ballot or Ballots.  Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot or Ballots and return the Ballot or Ballots to Kurtzman Carson Consultants LLC (the "Notice and Claims Agent").  For further information, refer to Section 6 below—Voting Procedures, and the Solicitation Procedures Order attached hereto as Appendix B.

Ballots cast by Holders in Classes entitled to vote must be received by the Notice and Claims Agent by 8:00 p.m. (Central Time) on February 20, 2020 (the "Voting Deadline"). For further information, refer to Section 6 below—Voting Procedures.

Ballots received after the Voting Deadline will not be counted.

The method of delivery of Ballots to be sent to the Notice and Claims Agent is at the election and risk of each Holder of a Claim.  Except as otherwise provided in the Plan or Solicitation Procedures Order (as defined below), delivery of a Ballot will be deemed made only when the original executed Ballot is actually received by the Notice and Claims Agent.  In all cases, sufficient time should be allowed to ensure timely delivery.  Original executed Ballots are required.

Delivery of a Ballot to the Notice and Claims Agent by facsimile, e-mail or any other electronic means will not be accepted.  No Ballot should be sent to the Debtors or the Debtors' financial or legal advisors, agents or representatives (other than the Notice and Claims Agent), and if so sent, will not be counted.

3.    _Recommendation_

**The Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept it.**

6

E.    **Confirmation of the Plan**

1.    *Plan Objection Deadline*

Objections to Confirmation of the Plan must be filed with the Bankruptcy Court and served so as to be actually received on or before **4:00 p.m. (Central Time)** on **[•], 2020**.

Unless objections to Confirmation are timely served and filed in compliance with the Solicitation Procedures Order, they will not be considered by the Bankruptcy Court. For further information, refer to Section 5 below—Statutory Requirements for Confirmation of the Plan.

2.    *Confirmation Hearing*

The Bankruptcy Court has scheduled the hearing to consider confirmation of the Plan (the "Confirmation Hearing") for **[•], 2020 at [•]:00 a.m. (Central Time)**. The Confirmation Hearing may be adjourned by the Bankruptcy Court or the Debtors without further notice other than by announcement in open court and/or notice(s) of adjournment filed on the docket with the Bankruptcy Court's permission.

## 2.    BACKGROUND

A.    **Debtors, Transactions with Affiliates and Directors and Officers**

1.    *WSTR Holdings*

Debtor WSTR Holdings is a Delaware limited liability company whose members today include affiliates of The Energy & Minerals Group LP (together with its managed funds, "EMG") and other investors (together with EMG, the "Sponsors").

Debtor WSTR Holdings is the direct parent company of and owns 100% of the equity of Debtor WSTR, an Oklahoma limited liability company. WSTR is the direct parent company of and owns 100% of the equity of each of Debtor WSTR II, an Oklahoma limited liability company, Debtor WSTR Operating, a Delaware limited liability company, and Debtor WSP Finance, a Delaware corporation.

The corporate structure chart below provides a general overview of the relationship of the Debtors.

SC1:5119879.1



2.    _WSTR_

Debtor WSTR, previously known as American Energy – Woodford, LLC, was originally formed on October 1, 2013 by American Energy Partners, LP ("AELP"), a shared services platform founded by Aubrey McClendon to invest in and manage oil and gas exploration and production ("E&P"), infrastructure and other onshore U.S. energy-focused companies.  In February 2014, investment funds affiliated with and managed by EMG and other private equity investors made equity commitments to WSTR through WSTR Holdings, previously known as American Energy Woodford Holdings, LLC.  With these equity commitments and other debt financing, WSTR acquired certain Mississippian Lime and Woodford Shale assets from Calyx Energy, LLC, Calyx Energy II, LLC and Liberty Energy, LLC.  In the second half of 2014, WSTR acquired certain Mississippian Lime and Woodford Shale assets from B&W Operating, LLC.  The Debtors conducted their E&P activities primarily through WSTR.

In February 2016, WSTR Holdings and its businesses were separated from AELP to become a standalone company, fully independent of the AELP platform.  As part of the separation, WSTR changed its name from "American Energy – Woodford, LLC" to "White Star Petroleum, LLC" and WSTR Holdings changed its name from "American Energy Woodford Holdings, LLC" to "White Star Petroleum Holdings, LLC" in the first quarter of 2016.

Contemporaneously with the separation from AELP in 2016, WSTR entered into an agreement to purchase certain Mississippian Lime and Woodford Shale assets from Devon Production Company, LP for approximately $200 million (the "Devon Acquisition").  The acquired assets included approximately 210,000 largely contiguous net acres, more than doubling WSTR's production, cash flow and acreage footprint.  The Devon Acquisition closed on June 30, 2016 and the majority of the purchase price was funded with equity contributions from the sponsors of WSTR at that time and the remainder was funded by Debtor WSTR with borrowings under the RBL Credit Agreement (as defined below).

In 2017, WSTR invested in off the ground leasing west of the Nemaha Ridge in Garfield County, funded through borrowings under the RBL Credit Agreement, to build WSTR's

8

position in the Sooner Trend Anadarko Canadian Kingfisher ("STACK") play and diversify its portfolio.

The Debtors closed additional transactions for the purchase of producing oil and gas properties and leaseholds, funded by borrowings under the RBL Credit Agreement, which increased the Debtors' leasehold position in Alfalfa, Grant, Noble, Payne, Logan, and Garfield counties in Oklahoma.

### 3.    *WSTR II*

Debtor WSTR II was formed in 2017 in connection with the acquisition of Lighthouse Oil and Gas LP ("Lighthouse"). The acquisition was funded by Debtor WSTR Holdings through the issuance of series B common units to the two largest Lighthouse equity holders. The remainder of the acquisition was funded by Debtor WSTR with borrowings under the RBL Credit Agreement. The 18,500 net acres acquired extended WSTR's footprint into the Anadarko Basin in Western Oklahoma and included development targets in Cleveland, Tonkawa and Cottage Grove formations. Subsequent to the closing, Lighthouse converted to an Oklahoma limited liability company and was renamed WSTR II and certain of its affiliates were consolidated into Debtor WSTR II. All E&P activities related to the Lighthouse assets are conducted through WSTR II.

As of December 31, 2018, WSTR and WSTR II together had an interest in 883 gross producing wells (475 net) and both WSTR and WSTR II operated the majority of the wells. During 2018, WSTR also operated, through contractual arrangements with third parties, two horizontal drilling rigs. On November 1, 2019, the sale of substantially all of the Debtors' assets closed and the Debtors thus no longer own or operate any producing wells.

### 4.    *WSTR Operating*

Debtor WSTR Operating is a Delaware limited liability corporation that was formed in 2016, following the separation from AELP. WSTR Operating directly employed the Debtors' management team and workforce and handled the payment of employees and other operational items.

### 5.    *WSP Finance*

Debtor WSP Finance, formerly known as AEW Finance Corporation, was incorporated in September 2014 as a wholly owned subsidiary of WSTR for the purpose of co-issuing (with WSTR) 9.00% notes due September 15, 2022 (the "Unsecured Notes").

### 6.    *Historical Transactions with Affiliates*

The Lighthouse acquisition that formed WSTR II was with an affiliate of EMG. EMG owned 49.42% of Lighthouse at the time of the purchase and a portion of the series B units issued in the transaction were issued to an affiliate of EMG. EMG did not receive any of the cash consideration in connection with the transaction. EMG did not have a controlling interest in Lighthouse and the transaction was negotiated directly between WSTR and Talala Opportunities, which owned 49.42% of Lighthouse.

9

7.    *Relationship with EMG*

EMG has made substantial equity contributions to WSTR Holdings and held a controlling interest in the company since 2014.  WSTR Holdings has not made any dividend or other cash distributions to EMG since its formation.

8.    *Managers and Officers Exculpation*

The Debtors—other than WSP Finance, which does not have any independent third-party creditors other than in connection with the RBL Credit Agreement, Term Loan and Unsecured Notes Indenture (each as defined below)—are Delaware or Oklahoma limited liability companies with customary exculpation clauses in their organizational documents.  The Debtors' organizational documents contain language that purports to eliminate fiduciary duties to persons other than members of the applicable company, and to further limit liability for any losses sustained or liabilities incurred as a result of any act or omission in connection with the conduct of the business except as provided in the organizational documents.  The Litigation Trust discussed below will be established and vested with the Avoidance Actions and certain potential claims against the officers and directors (the "Prepetition D&O Actions"), with any recovery on such Prepetition D&O Actions subject to the defenses to the Prepetition D&O Actions and applicable non-bankruptcy law and limited to the Debtors' available D&O Policies.

**B.    Operations**

As of the Petition Date, the Debtors were in the business of acquiring, developing, operating and producing unconventional oil and natural gas properties and employing specialized extraction techniques, including horizontal drilling and hydraulic fracturing.  Through oil and gas leases entered into with mineral rights owners throughout the Mid-Continent region, the Debtors held working interests in oil and gas properties that provided for the right to drill and maintain wells.  The Debtors and third-party operators operated these wells with the expectation of producing hydrocarbons, and the hydrocarbons were then transported by pipeline or by tanker truck to various purchasers.  After receipt of proceeds, the Debtors distributed funds to various working interest holders, royalty interest holders, governmental entities and other parties, as applicable, in addition to retaining the Debtors' proportionate share of the proceeds.

As of December 31, 2018, the Debtors had proved reserves of approximately 84.4 million barrels of oil equivalent ("boe") across approximately 315,000 net leasehold acres in primarily Creek, Dewey, Garfield, Lincoln, Logan, Noble and Payne counties of Oklahoma.  The Debtors' E&P operations were focused on three distinct operating districts:  Cherokee Platform, STACK and the Anadarko Basin.  Below is a map of WSTR's acreage by district:



As of December 31, 2018, approximately 80% of WSTR's total acreage was held by production, meaning that WSTR was party to leases granting WSTR rights for the exploration and production of hydrocarbons as long as WSTR continued to produce hydrocarbons in paying quantities from the acreage associated with those leases. The remaining 20% of WSTR's total acreage was associated with leasehold interests that were in their primary term, meaning that the leases could expire after a period of time unless WSTR was producing hydrocarbons in paying quantities or conducting operations in an effort to discover and produce hydrocarbons or otherwise extended the primary term.

The Debtors' revenues were derived from the sale of oil and natural gas, as well as the sale of natural gas liquids ("NGL") that were extracted from natural gas during processing. The majority of revenues were from oil sales. WSTR's average daily net sales volume during the year ended December 31, 2018 was approximately 18,800 boe per day.

As of the Petition Date, the Debtors generally sold oil and natural gas under two common types of agreements, both of which included a transportation charge. One is a net-back arrangement, under which the Debtors sold oil or natural gas at the wellhead and collected a lower relative price to reflect transportation costs incurred by the purchaser. Alternatively, the Debtors sold oil or natural gas at a specific delivery point, paid their own transportation costs to a third-party carrier, and received a price with no transportation deduction. In this case, the Debtors recorded the separate transportation cost as gathering, processing and transportation costs. The Debtors utilized midstream services, which involved the gathering, transportation, and processing of produced hydrocarbons from various third-party providers. WSTR was a party to a long-term gas gathering and processing agreement with EnLink Oklahoma Gas Processing, LP ("EnLink"), as successor in interest to TOMPC LLC, dated as of June 21, 2014 (as amended, the "GGPA"), pursuant to which EnLink provided certain gas gathering and processing services.

The Debtors also maintained certain of their own saltwater gathering and disposal systems. The Debtors transported produced saltwater primarily through their own pipeline

11

infrastructure to 85 saltwater disposal wells, where it was reinjected into disposal reservoirs. This system was critical because the Mid-Continent region's carbonate formation has a relatively high rate of produced saltwater relative to produced oil and gas, resulting in comparably higher disposal costs than costs in other regions.

Unconventional wells developed using the hydraulic fracturing process typically produce a high percentage of reserves in their first two years of production, followed by steep production declines and then a flattening out of production over time. In order to maintain stable production levels, the Debtors required significant upfront capital investments in new wells that were expected to be recouped over time. As a result of this, the declines in commodity prices in the fourth quarter of 2018 and the Debtors' financial condition, the Debtors ceased drilling new wells in April 2019, and had not resumed such activities prior to the November 1, 2019 closing of the sale of substantially all of the Debtors' assets.

### C.    Financial Performance and Cash Position

WSTR's net loss for the year ended December 31, 2018[6] was $114 million, as compared to a net loss of $14 million in 2017. WSTR had negative working capital of approximately $61 million as of December 31, 2018 and approximately $70 million as of the Petition Date. As of the Petition Date, WSTR had no unrestricted cash as a result of the exercise of remedies by the RBL Lenders (as defined below).

### D.    Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $346.8 million in total funded debt, excluding accrued interest. The following table summarizes the Debtors' prepetition indebtedness, and each category is described in greater detail below:

| Debt | Maturity | Approximate Principal Amount excluding interest (millions) |
|---|---|---|
| First Lien Revolving Credit Facility | June 2020 | $274 |
| Second Lien Term Loan | May 2023 | $58.0 |
| Unsecured Notes | September 2022 | $10.3 |
| Sale Leaseback | Various | $4.5 |
| TOTAL | | $346.8 |

#### 1.    *The First Lien Revolving Credit Facility*

The Debtors are party to the Revolving Credit Agreement, dated as of June 30, 2016 (the "RBL Credit Agreement"), which provides for a first lien revolving credit facility, among WSTR as borrower, the several lenders from time to time parties thereto (the "RBL Lenders") and MUFG Union Bank, N.A., as administrative agent and collateral agent for the

---

[6]    Financial statements for the year ended December 31, 2018 had not been finalized prior to the Petition Date due to issues with the Debtors' ability to continue as a going concern, and therefore all 2018 amounts presented are unaudited.

RBL Lenders (the "RBL Agent"). Each of WSTR Holdings, WSTR, WSP Finance and WSTR Operating is a guarantor of the RBL Credit Agreement pursuant to the RBL Amended and Restated Guarantee Agreement, dated as of June 30, 2016, and WSTR II is a guarantor pursuant to the Supplement No. 1, dated as of March 16, 2017, to the Amended and Restated Guarantee Agreement, dated as of June 30, 2016. Borrowings under the RBL Credit Agreement were to be used for, among other things, the acquisition, development and exploration of oil and gas properties, investments, capital expenditures and other transactions, working capital and other general corporate purposes. Interest under the RBL Credit Agreement is based on the prime rate or LIBOR plus a margin that varies based on the utilization of the facility. The RBL Credit Agreement's stated maturity is June 30, 2020.

The RBL Credit Agreement is a borrowing base facility pursuant to which funds can be borrowed only to the extent adequately covered by collateral. WSTR's borrowing base under its RBL Credit Agreement was initially set at $220 million at June 30, 2016 and was increased to $230 million at December 31, 2016. Following the acquisition of Lighthouse Oil and Gas LP in March 2017, the borrowing base reached a peak of $285 million. Outstanding borrowings under the revolver at December 31, 2016 were $142.6 million with availability of $87.4 million.

As of December 31, 2018, the facility under the RBL Credit Agreement had a borrowing base and total commitments of $275 million and was subject to scheduled semi-annual borrowing base redeterminations based on WSTR's oil and natural gas reserves as of June 30 and December 31, as well as automatic reductions of $5 million on the first date of each month beginning February 1, 2019. The Fifth Amendment of the RBL Credit Agreement, dated as of January 31, 2019, provided, among other things, that the scheduled borrowing base reduction of $5 million on February 1, 2019 would be extended to the earlier of (a) February 28, 2019 or (b) any default occurring under the terms of the RBL Credit Agreement. The Sixth Amendment of the Revolving Credit Agreement, dated as of February 27, 2019 (the "Sixth RBL Amendment"), established the borrowing base amount to be $181 million on April 30, 2019, subject to $5 million monthly borrowing base reductions starting in the subsequent months.

As of the Petition Date, the Debtors had drawn substantially all of the availability under the RBL Credit Agreement (approximately $274 million).

2.    *The Second Lien Term Loan*

On May 9, 2018, WSTR entered into a five-year second lien Term Loan with EnLink (the "Term Loan"). EnLink, the RBL Agent and the RBL Lenders together constitute the prepetition secured parties. The principal amount of the Term Loan is $58 million, which amortizes pursuant to a specified amortization schedule. Interest is payable on the Term Loan every quarter at an annual rate of 8.0%, beginning in the first quarter of 2020. Each of the Debtors is a guarantor of the Term Loan pursuant to the Term Loan Guarantee Agreement, dated as of May 9, 2018.

In November 2018, in conjunction with the RBL Credit Agreement borrowing base redetermination, the Term Loan was amended such that the $19.5 million amortization payment due March 31, 2019 was broken out into two payments and increased by $1.0 million,

with $9.75 million due on April 1, 2019 and $10.75 million due on October 1, 2019. Additionally, each of the $2.75 million payments due September 30, 2020 and December 31, 2020 were increased to $4.0 million, and the March 30, 2023 payment was reduced from $9.5 million to $6.0 million. In February 2019, in conjunction with the RBL Credit Agreement borrowing base redetermination, the Term Loan was amended such that the $9.75 million due on April 1, 2019 was extended to May 15, 2019.

### 3.    *The Unsecured Notes due September 15, 2022*

In September 2014, WSTR and its wholly owned subsidiary WSP Finance completed the issuance of $350 million of Unsecured Notes at a 9% cash-pay coupon. In 2015, WSTR and WSP Finance privately exchanged their outstanding Unsecured Notes for new 12% second lien notes due 2020 (the "Second Lien Notes") as part of a distressed debt restructuring (such transaction, the "Exchange"). Approximately $10.3 million in principal of the Unsecured Notes was left after the Exchange. As a result of the Exchange, the previous covenants are no longer applicable to the Unsecured Notes. Beginning in late 2015 and extending through August of 2016, the Debtors entered into a series of cash and equity transactions to fully redeem all outstanding Second Lien Notes.

The Unsecured Notes mature on September 15, 2022 and interest is payable at an annual rate of 9.0%, semi-annually in arrears on March 15 and September 15 of each year. For the years ended December 31, 2018 and 2017, WSTR recorded approximately $0.9 million in interest expense for the Unsecured Notes each year.

### 4.    *Sale-Leaseback*

On May 31, 2017, WSTR entered into a sale-leaseback transaction for its primary field office in Stillwater, Oklahoma for $4.9 million. Approximately $4.5 million currently remains outstanding. WSTR has remained the tenant and leased back the 17-acre property, which is its central northern Oklahoma field office.

### E.    Events Leading to the Commencement of the Debtors' Chapter 11 Cases

### 1.    *Adverse Market Conditions*

The Debtors' primary sources of liquidity, outside of equity contributions from the Sponsors, were historically cash flows from producing oil and gas properties as well as borrowings under the RBL Credit Agreement. Additionally, non-strategic asset dispositions provided a source of cash flow for use in enhancing the Debtors' liquidity. The cash flow from the Debtors' producing oil and gas properties is largely dependent on the prices received for oil, natural gas and NGL. Historically, these prices have been extremely volatile, impacting both cash flows from operations and WSTR's borrowing base under its RBL Credit Agreement.

Independent oil and gas companies, such as the Debtors, with Mississippian Lime-weighted assets in the Mid-Continent region have been particularly hard-hit by volatile market conditions in recent years and the majority of the Debtors' peers in the region have filed for chapter 11 since 2015. This is in large part due to operational challenges unique to the region, including complex geological characteristics. One of these challenges is the

14

Mississippian Lime's relatively high ratio of "saltwater" to produced oil and gas. During the normal production of oil and gas, saltwater mixed with hydrocarbon byproducts comes to the surface, and its separation and disposal increases production costs. Low production volumes and higher than expected production costs, together with allegations that increased saltwater injection by the operators in the area caused increased seismic activity, resulted in many operators reducing activity and many capital providers discounting asset values in the region.

> ### 2. _Financial Response_

The Debtors employed a number of strategies designed to achieve competitive returns and diversify their asset base since 2014. These include aggressive cost reduction initiatives in both drilling and completion expenditures as well as lease operating expenditures. Additionally, following the Devon Acquisition, the Debtors implemented a strategy to expand and diversify their oil and gas portfolio to establish development opportunities outside the Mississippian Lime, all while remaining focused on achieving the best possible results from its legacy Mississippian Lime-weighted assets.

The Devon Acquisition facilitated a recapitalization of the Debtors, including a refinancing of WSTR's prior revolving credit facility (the "Original RCF"). Contemporaneously with the closing of the Devon Acquisition in June 2016, WSTR entered into the new RBL Credit Agreement with an initial borrowing base of $220 million and commitments of $210 million. At that time, WSTR repaid the remaining balance of $48.8 million to eliminate the Original RCF. In November 2016, the RBL Credit Agreement was amended to increase the borrowing base and total commitments to $230 million. As of December 31, 2016, WSTR had $142.6 million borrowed under the RBL Credit Agreement and $1.0 million in outstanding letters of credit.

The Debtors also strengthened their balance sheet and extended their liquidity runway through strategic repurchases of indebtedness. At the beginning of 2016, WSTR had approximately $348 million of Second Lien Notes outstanding. In February 2016, WSTR repurchased Second Lien Notes with a carrying value of $196.3 million (par value of $141.6 million which includes paid-in-kind interest) for $18.2 million. Additionally, in April and June 2016, WSTR repurchased $42.9 million in carrying amount (par value of $31.8 million which includes paid-in-kind interest) of the Second Lien Notes for $23.2 million. In June 2016, WSTR exchanged an additional $109.4 million in carrying amount (par value of $81.2 million which includes paid-in-kind interest) of the Second Lien Notes for $63.2 million in equity of WSTR Holdings. Finally, on August 11, 2016, WSTR redeemed all of the remaining outstanding Second Lien Notes, which had a carrying value of $0.3 million, for $0.4 million. The net result was an elimination of the Second Lien Notes and a substantial reduction in WSTR's funded debt.

For the two years ending December 31, 2018, the Debtors also proactively sold midstream assets and non-strategic properties in an aggregate amount of approximately $52.3 million to strengthen their balance sheet and enhance liquidity. These dispositions included the sale of WSTR's interest in a midstream gathering system and associated assets to 4 AM Midstream, LLC in July 2017, the sale of non-strategic properties located in Payne, Noble and Pawnee counties to a third party in November 2017, and the sale of approximately 21,600 net acres of developed leasehold in Noble County (representing an immaterial portion of WSTR's proved reserves) to a third party in December 2018.

Finally, the Debtors adjusted their midstream pipeline commitments to EnLink in light of the changes in their business. The EnLink GGPA initially included annual minimum volume commitments ("MVC") of natural gas from a portion of WSTR's acreage and required WSTR to make annual deficiency payments if there was a shortfall in delivering the specified MVC each contract year. The GGPA was amended, effective December 1, 2015, to waive the deficiency payment that would have otherwise been payable by WSTR in 2016, reduce the deficiency payment due in 2017 by $7.5 million and extend the MVC period two additional years until 2023. WSTR paid $5.5 million in 2017 in deficiency payments, net of the $7.5 million credit. In addition, as of May 2018, WSTR projected that its future MVC shortfall payments to EnLink from 2018 through 2023 would be approximately $115 million. As a result, on May 9, 2018, WSTR and EnLink amended the GGPA to eliminate the MVC. In return, WSTR conveyed to EnLink a one percent overriding royalty interest on EnLink gathered volumes from current and future wells on existing leases, as well as an upfront payment of $19.5 million (in line with the existing minimum volume deficiency payment for 2018, plus $0.2 million in transaction-related fees), and a five-year second lien Term Loan of $58.0 million. As a result, the Debtors do not currently have minimum volume commitments, drilling commitments or firm tariffs.

### 3.    *Loss of Access to Working Capital Facility*

For the two years ending December 31, 2018, WSTR's cash flows from operations were approximately $145.9 million while capital expenditures, inclusive of acquisitions, were $302.3 million, a deficit of approximately $156.6 million. The deficit was funded primarily from borrowings under the RBL Credit Agreement as well as proceeds of approximately $52.3 million from the sale of certain non-core assets.

In January 2019, WSTR's borrowing base was $275 million with set automatic reductions of $5 million on the first date of each month beginning February 1, 2019. The borrowing base was subject to redetermination on March 1, 2019 based upon an engineering report prepared by approved petroleum engineers with an as of date of December 31, 2018.

In January 2019, WSTR requested that the February 1, 2019 scheduled $5 million reduction of the borrowing base be extended to, in part, assist WSTR with its ongoing efforts to recapitalize. The RBL Agent and RBL Lenders agreed and the parties entered into the Fifth RBL Amendment extending the borrowing base reduction to February 28, 2019.

In February 2019, WSTR requested a further extension of the scheduled reductions as well as a deferral of the March 1, 2019 borrowing base redetermination based upon a significant decline in the borrowing base. On February 27, 2019, the RBL Agent and RBL Lenders agreed to an additional forbearance and entered into the Sixth RBL Amendment. The Sixth RBL Amendment provided, among other things, that (i) the March 1, 2019 borrowing base redetermination would be deferred by approximately two months such that it would be effective on April 30, 2019 at $181 million, (ii) WSTR would continue its capital raise efforts to refinance their indebtedness, and (iii) WSTR would begin a marketing process to sell its business in the event the capital raise efforts were unsuccessful. The Debtors engaged an investment banker, Guggenheim Securities, LLC ("Guggenheim Securities"), to commence the marketing process.

16

WSTR continued its capital raise efforts in good faith that it would receive sufficient financing to refinance its existing indebtedness.  During this period, WSTR received interest and term sheets from potential investors and those discussions continued through mid-April 2019.  Unfortunately, on or around mid-April, 2019, WSTR determined that it would be unable to reach acceptable terms with those investors and informed the RBL Agent that WSTR was pivoting to a sale of its business, likely under a chapter 11 sale process.

In furtherance of such discussions, the RBL Agent, on April 23, 2019, prepared a proposed forbearance and seventh amendment of the RBL Credit Agreement that would allow for a continued out-of-court marketing process.  WSTR and the RBL Agent negotiated over the terms of the forbearance agreement for a week, but the parties were unable to come to an agreement.

On or before April 29, 2019, WSTR began funding retainers to professionals in contemplation of a potential chapter 11 filing.  On April 29, 2019, WSTR submitted a notice of borrowing to the RBL Agent to draw the remaining approximately $800,000 in availability under the RBL Credit Agreement, despite the impending borrowing base reduction.  The RBL Agent declined this request.

The Debtors did not make the borrowing base deficiency payment by the time required on April 30, 2019.  The RBL Agent subsequently exercised certain rights and swept (but did not apply to the revolver) approximately $8.1 million of cash from WSTR's accounts and provided notice of the sweep.  In that notice, the RBL Agent informed WSTR that it remained available to discuss a budget for the consensual use of all swept funds under a mutually acceptable forbearance agreement.

After the sweep, the RBL Agent allowed WSTR to access the swept funds and honored every expenditure request made by WSTR from the time of the cash sweep through the Petition Date, with one exception regarding an audit payment.  After discussions with the RBL Agent, WSTR ultimately withdrew the request to make such payment.

On May 6, 2019, the RBL Agent, the RBL Lenders and WSTR entered into that certain Limited Waiver to Revolving Credit Agreement pursuant to which the RBL Agent and the RBL Lenders documented WSTR's ongoing access to the swept cash to fund outstanding checks and ACH revenue payments, as well as going forward expenditures.

Subsequently, on May 21, 2019, the RBL Agent, the RBL Lenders, and WSTR entered into that certain Forbearance Agreement and First Amendment to the Limited Waiver to Revolving Credit Agreement while they continued to negotiate terms of debtor-in-possession financing.  Under this forbearance agreement, WSTR also released all claims against the RBL Agent and RBL Lenders.  Ultimately, all of the swept cash was returned to and used by WSTR.

At the Petition Date, the Debtors remained cash flow positive on an operating basis (without taking into account debt service or restructuring expenses).  The liquidity situation

SC1:5119879.1

caused by the borrowing base reduction and the related event of default under the RBL Credit Agreement was the primary driver of these chapter 11 cases.

### 4. *Notice of Term Loan Default*

Following the cash sweep by the RBL Lenders, on May 3, 2019, EnLink provided notice of the existence of certain specified defaults as a result of: (a) WSTR's failure to furnish to EnLink the audited consolidated balance sheets and annual financial statements for the year ended December 31, 2018, among other deliverables; (b) WSTR's failure to pay by April 30, 2019 interest that was due on March 15, 2019 under the Unsecured Notes; and (c) the payment default that occurred on April 30, 2019 under the RBL Credit Agreement.

EnLink has provided notice that, pursuant to the terms of the Term Loan, the Term Loan was then bearing interest, payable upon demand, at a rate per annum equal to the interest rate as set forth in the Term Loan (8.00% per annum) plus 2.00%.

### 5. *Notice of Unsecured Notes Default*

In addition to normal ordinary operating expenses, the Debtors were required to make periodic interest payments on account of the Unsecured Notes. Failure to make such interest payments before the expiration of the thirty-day grace period results in events of default under the Indenture, dated as of September 16, 2015, as amended by the First Supplemental Indenture, dated as of June 24, 2015.

While the Debtors had some cash available from dispositions and operating cash flows, the Debtors determined that using the cash proceeds to make interest payments was not prudent and not in the best interests of the Debtors and the Debtors' stakeholders. WSTR did not pay interest that was due on March 15, 2019 under the Unsecured Notes.

### 6. *Appointment of Independent Manager of WSTR Holdings*

In anticipation of a potential restructuring or sale transaction, and after reviewing the qualifications of the candidates, on May 6, 2019, the members of the board of WSTR Holdings (the "Managers") unanimously approved the appointment of Patrick J. Bartels, Jr. as independent manager (the "Independent Manager") to advise on and act for the Debtors on matters related to a potential restructuring or sale transaction. The responsibilities of the Independent Manager include: (a) reviewing the terms of any plan of reorganization or liquidation, any sale or offering of equity interests in the Debtors, and any pre- or postpetition asset purchase agreement to which any affiliate of the Debtors is proposed to act as sponsor or party thereto; and (b) supervising the structuring of a plan of reorganization or liquidation for the Debtors. Since his appointment, the Independent Manager has been involved with the prepetition negotiations with the RBL Agent and RBL Lenders and their advisors, the preparation for these chapter 11 cases, the sale of the Debtors' assets and the chapter 11 plan confirmation process.

SC1:5119879.1

3.    SIGNIFICANT EVENTS AND INITIATIVES IN THESE CHAPTER 11 CASES

The following is a general summary of significant events in these chapter 11 cases, including a discussion of the Debtors' restructuring and business initiatives since the commencement of these chapter 11 cases.

A.    Overview of Chapter 11

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization and orderly liquidation.  Chapter 11 helps a company to maximize recovery to all stakeholders.  Chapter 11 promotes equality of treatment for similarly situated creditors and interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate comprising all property and all other legal and equitable interests of the debtor as of the date of the debtor's petition for chapter 11 protection.  Chapter 11 allows the debtor to continue all business operations and remain in possession of all property of the estate as a "debtor-in-possession."

The United States Trustee for the Western District of Oklahoma (the "U.S. Trustee") monitors the progress of a chapter 11 case and supervises its administration.  In particular, the U.S. Trustee is responsible for monitoring the debtor-in-possession's operation of the business and the submission of operating reports and fees.

A chapter 11 case often culminates in the consummation of a chapter 11 plan. The plan includes a classification of claims against and interests in the debtor and specifies how each class will be treated.  Among other things, the plan must be confirmed by the bankruptcy court before it is implemented.

B.    The Commencement of the Voluntary Cases and the Involuntary Case

On May 28, 2019, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Delaware Court, commencing the Voluntary Cases. Simultaneous to the filing, the Debtors filed the First Day Motions (as defined below) with the Delaware Court.

On May 24, 2019, prior to the commencement of the Voluntary Cases, Mustang Heavy Haul, LLC, Latshaw Drilling Company, LLC ("Latshaw"), MS Directional LLC, Baker Hughes Oilfield Operations LLC ("Baker Hughes") and Cactus Drilling Company, LLC (collectively, the "Petitioning Creditors") filed an involuntary petition against Debtor WSTR in the Oklahoma Court.

In response, on June 7, 2019, Debtor WSTR filed with the Oklahoma Court a motion to dismiss the Involuntary Case and a motion to allow the Voluntary Cases to proceed in the Delaware Court.  After further discussions with the parties-in-interest, on June 13, 2019, the Debtors filed an amended motion to transfer the Voluntary Cases to the Oklahoma Court and a motion to suspend the Involuntary Case.

SC1:5119879.1

The Oklahoma Court denied the Debtors' motions to dismiss the Involuntary Case and to suspend the Involuntary Case, and approved the Debtors' amended motion to transfer the Voluntary Cases to the Oklahoma Court. Accordingly, the Voluntary Cases were transferred to the Oklahoma Court on June 20, 2019. On July 3, 2019, the Oklahoma Court entered a stipulation and agreed order between the Debtors, the Committee (as defined below) and the Petitioning Creditors consolidating the WSTR Voluntary Case into the Involuntary Case under case number 19-12521 (JDL).

### C.    The Chapter 11 Cases

#### 1.    *First Day Relief*

On May 28, 2019, the Debtors filed numerous motions seeking relief intended to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, and to facilitate the administration of these chapter 11 cases (the "First Day Motions"). On May 28, 2019, the Oklahoma Court entered an order directing the Delaware Court to hear only the First Day Motions that the Delaware Court deemed critical, just and proper. Accordingly, at the first day hearing, the Delaware Court only granted certain of the First Day Motions.

Among other things, the orders entered by the Delaware Court granting the First Day Motions (the "First Day Orders") allowed the Debtors to continue certain normal business activities not specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval. In particular, the First Day Orders authorized the Debtors to:

- pay prepetition claims of certain vendors and lienholders;

- pay prepetition claims of royalty interest holders;

- pay prepetition compensation and reimbursable expenses, pay and honor benefits and other programs and continue workforce obligations;

- continue to use their prepetition cash management system, bank accounts and business forms;

- continue their insurance and surety bond programs;

- provide adequate assurance to utility providers and

- pay prepetition taxes.

With respect to the payments to vendors and lienholders, the Debtors received authorization on an interim basis on May 29, 2019 [Doc. 33] and on a final basis on June 26, 2019 [Doc. 139]. Pursuant to the final order, the Debtors are authorized to pay up to $15.2 million of prepetition claims of certain vendors and lienholders. With respect to prepetition royalty interest payments, joint interest billings and other obligations owing under oil and gas leases, the Debtors received authorization on an interim basis on May 29, 2019 [Doc. 28] and on

20

a final basis on June 27, 2019 [Doc. 147].  Pursuant to the final order, the Debtors were authorized to pay up to $53.8 million to satisfy these obligations.

In addition, the commencement of the Debtors' chapter 11 cases triggered the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of all liens against property of the Debtors and the commencement or continuation of prepetition litigation against the Debtors.  Subject to limited exceptions, the automatic stay will remain in effect until the Effective Date of the Plan.

### 2.    *Debtor-In-Possession Financing*

In addition to the other First Day Motions, the Debtors also filed a motion seeking authority to obtain postpetition financing on a secured, superpriority basis in the aggregate maximum principal amount of up to $28.5 million [Doc. 16] (the "DIP Motion").  On May 29, 2019, the Delaware Court approved the DIP Motion on an interim basis and entered an order [Doc. 36] authorizing, among other things, the Debtors to draw up to $15 million in the aggregate principal amount.

A final hearing on the DIP Motion was scheduled for July 11, 2019.  At the objection deadline, five parties, including the U.S. Trustee and the Committee, filed timely objections.  By agreement with the DIP lenders and the Committee, the Debtors adjourned the hearing to allow further time for negotiations among the parties.  Following these negotiations, the Debtors filed a revised proposed final DIP order on July 22, 2019 [Doc. 322].  At a consensual hearing on July 23, 2019, the Bankruptcy Court approved and entered the revised final DIP order (the "Final DIP Order") [Doc. 328] authorizing the Debtors to draw up to $28.5 million.

### 3.    *Continuation of the Debtors' Operations*

From the Petition Date through the closing of the sale of substantially of the Debtors' assets, the Debtors operated in the ordinary course of business.  Since the sale closed on November 1, 2019, the Debtors have been working with their key creditor constituencies on the development of the Plan, the continued orderly disposal of residual assets and the administration of these chapter 11 cases.  In accordance with the First Day Orders, the Debtors paid certain prepetition claims of vendors, lienholders and employees, and the Debtors continue to pay their vendors, lienholders and employees in the ordinary course of business postpetition as amounts become due and payable.

### 4.    *The Committee*

On June 10, 2019, the Office of the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Committee") [Doc. 60].  The five members of the Committee are:  (a) Baker Hughes; (b) Halliburton Energy Services, Inc.; (c) Latshaw; (d) Pyramid Tubular Products, LLC and (e) Wilmington Trust, National Association.  The Committee retained Morgan, Lewis & Bockius, LLP as counsel [Doc. 332], Conner & Winters, LLP as counsel [Doc. 330] and Conway Mackenzie, Inc. as financial advisor [Doc. 331].

5.     *Retention of Debtor Professionals*

On June 21, 2019, the Debtors filed applications to retain their professionals. These included:  (a) an application to retain Sullivan & Cromwell LLP as co-counsel to the Debtors [Doc. 90], (b) an application to retain GableGotwals as co-counsel to the Debtors [Doc. 94], (c) an application to retain Morris, Nichols, Arsht & Tunnell LLP as Delaware counsel to the Debtors [Doc. 91], (d) an application to retain Alvarez & Marsal North America LLC ("A&M") to provide restructuring services [Doc. 87], (e) an application to retain Guggenheim Securities as investment banker for the Debtors [Doc. 88], (f) an application to retain Kurtzman Carson Consultants LLC as the Debtors' administrative agent [Doc. 89] and (g) a motion to retain, compensate and reimburse professionals utilized in the ordinary course of business [Doc. 77] (collectively, the "Retention Applications").  Each of the Retention Applications was approved [Docs. 235, 238, 242, 243, 245, 247 and 293].

6.     *Key Employee Retention Plan*

On June 21, 2019, the Debtors filed a motion (the "KERP Motion") seeking authorization to pay termination benefits and retention awards to non-insider employees [Doc. 100].  The termination benefits provided for a lump-sum cash severance benefit award to displaced non-insider employees.  Specifically, displaced non-insider employees were entitled to a cash severance benefit equal to four weeks of base salary for employees with less than one year of service, five weeks of base salary for employees with between one and two years of service or six weeks of base salary for employees with more than two years of service.  Additionally, displaced non-insider employees with less than one year of service were entitled to receive one month of COBRA premiums and displaced non-insider employees with more than one year of service were entitled to receive two months of COBRA premiums.  As a condition to receiving these benefits, displaced non-insider employees were required to execute a general release of claims against the Debtors.

The retention awards for non-insider employees ranged from 5% to 29% of the recipient's base salary.  One-third of each award was payable on July 25, 2019, with the remainder payable upon the earlier of the closing of a sale and emergence from these chapter 11 cases, in each case subject to the recipient's continued employment.  Non-insider employees were also be entitled to any unpaid portion of the award on an involuntary termination of his or her employment without cause or due to death or disability.  Approximately $881,000 in these retention awards have been paid during these chapter 11 cases.

The U.S. Trustee and the Committee objected to the relief requested in the KERP Motion.  Following a contested evidentiary hearing on July 11, 2019, the Bankruptcy Court overruled the objections and entered an order approving the KERP Motion [Doc. 291].

7.     *Key Employee Incentive Plan*

On June 21, 2019, the Debtors filed a motion (the "KEIP Motion") seeking authorization to implement a key employee incentive plan (the "KEIP") [Doc. 79].  The KEIP provides six of the Debtors' key leaders with the opportunity to earn awards based on three performance metrics—gross sale proceeds, barrel of oil equivalent production and operating

22

disbursements. Each metric was measured at the time of a sale transaction against the threshold, target and stretch goals for each metric. To earn a payout under any of the performance metrics, threshold performance had to be achieved. At threshold performance, KEIP payouts were earned at 67% of target if threshold performance is achieved (but not exceeded). Stretch performance results in 150% of the target payout level. For the sale proceeds metric, KEIP participants were entitled to share in 1.5% of the gross sales proceeds above the stretch performance level; otherwise, no additional amounts were payable for performance above the stretch level. Approximately $1.25 million in KEIP payouts have been paid.

The U.S. Trustee and the Committee objected to the relief requested in the KEIP Motion. Following a contested evidentiary hearing on July 11, 2019, the Bankruptcy Court overruled the objections and entered an order approving the KEIP Motion [Doc. 292].

8.      *Schedules and Statements and 341 Meeting*

On July 19, 2019, the Debtors filed their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") with the Bankruptcy Court. On August 22, 2019, the Debtors filed certain amendments to their Schedules. The Schedules and Statements are available for review at the Debtors' case information website, http://www.kccllc.net/whitestar.

On July 22, 2019, after the filing of the Schedules and Statements, the U.S. Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code.

9.      *Bar Date and Claims Process*

On June 26, 2019, the Debtors filed a motion requesting entry of an order establishing bar dates for filing proofs of claim [Doc. 144]. On July 11, 2019, the Bankruptcy Court entered an order [Doc. 267] setting August 23, 2019 as the general bar date for the filing of proofs of claims against the Debtors. Subject to certain exceptions, all persons and entities holding prepetition claims were required to file a proof of claim on or before the August 23, 2019 bar date. As of the August 23, 2019 bar date, 4,181 proofs of claim were filed against the Debtors.

On August 27, 2019, Patricia Gilbreth and Austin Martin filed a motion [Doc. 446] (the "Class Proof of Claim Motion") seeking an order permitting the filing of class proofs of claim on behalf of themselves and putative classes of Oklahoma royalty and other oil-and-gas interest owners who alleged underpayment or non-payment of royalties and/or interest for late-paid oil-and-gas proceeds from the Debtors. On October 10, 2019, the Debtors and the Committee filed objections to the Class Proof of Claim Motion [Docs. 674, 675]. The RBL Agent filed a joinder to the Debtors' objection [Doc. 675]. Following a contested hearing on October 17, 2019, the Bankruptcy Court sustained the objections and entered an order denying the Class Proof of Claim Motion [Doc. 726].

To facilitate the claims reconciliation process, on September 23, 2019, the Debtors filed a motion (the "Claims Objections Procedures Motion") for leave to file omnibus objections to claims and establishing related procedures [Doc. 629]. On October 11, 2019, the

23

Bankruptcy Court entered an order granting the Claims Objections Procedures Motion (the "Claims Objections Procedures Order") [Doc. 679] authorizing the Debtors to file omnibus claims objections on various grounds.

On October 16, 2019, pursuant to the Claims Objections Procedures Order, the Debtors filed amended omnibus objections to claims (the "First Set of Claims Objections") [Docs. 708-713]. The Debtors received four objections to the First Set of Claims Objections. The Debtors have been in discussions with the four objecting parties and resolved each of these consensually. The Bankruptcy Court entered orders with respect to the First Set of Claims Objections [Docs. 807-812, 864, 929, 930]. On November 15, 2019, pursuant to the Claims Objections Procedures Order, the Debtors filed a second set of omnibus objections to claims [Docs. 839-844]. The Debtors did not receive any objections with respect to these and the Bankruptcy Court entered orders with respect to these objections [Docs. 911-916].

>    10.    *Stay Relief*

During these chapter 11 cases, several parties have filed motions seeking relief from the automatic stay to proceed with litigation against the Debtors and the Debtors' insurers. Nearly all of these motions were resolved by agreed orders entered by the Bankruptcy Court. In particular:

- On July 24, 2019, David and Myra Reid, Valerie Branyan and Timothy Harris, on behalf of themselves and others similarly situated, filed a motion for relief from the automatic stay to permit the continuation of state court proceedings to pursue collection of insurance proceeds only [Doc. 329]. On August 9, 2019, the Bankruptcy Court entered an agreed order consensually resolving this motion [Doc. 360].

- On August 30, 2019, Greg and Rachell Savory filed a motion seeking relief from the automatic stay to allow state court action against the Debtors' insurance to proceed [Doc. 459]. On September 23, 2019, the Bankruptcy Court entered an agreed order consensually resolving this motion [Doc. 619].

- On September 6, 2019, James and Sharon Binkley, Charlotte and Hubert Hutchens, Greg and Vonda Goad and Lester Anson filed a motion for relief from the automatic stay to allow payment of prepetition confidential settlement by the Debtors' insurance carrier [Doc. 475]. On October 11, 2019, the Court entered an agreed order consensually resolving this motion [Doc. 677].

- On September 11, 2019, Lisa West, Stormy Hopson, Auburn and Douglas Cloyes, Dell Livsey and Julia and Dale White filed a motion for relief from the automatic stay to permit the continuation of a civil action related to earthquake damages [Doc. 507]. On October 11, 2019, the Bankruptcy Court entered an agreed order consensually resolving this motion [Doc. 680].

24

- On September 20, 2019, R.E. Blaik, Inc. filed a motion for relief from the automatic stay to permit continuation of a proceeding related to well damage [Doc. 507]. On October 16, 2019, the Court entered an agreed order consensually resolving this motion [Doc. 703].

- On September 3, 2019, Superior Pipeline Company, L.L.C. ("Superior Pipeline") filed a motion for relief from the automatic stay to permit continuation of state court proceedings [Doc. 462]. On September 19, 2019, the Debtors filed an objection to Superior Pipeline's motion [Doc. 596], which the Committee joined [Doc. 602]. Prior to the hearing on Superior Pipeline's motion on October 17, 2019, Superior Pipeline withdrew its motion [Doc. 714].

- On September 18, 2019, plaintiffs in three lawsuits against the Debtors filed a motion for relief from the automatic stay to permit continuation of proceedings against the Debtors and other non-debtor parties related to earthquake damages [Doc. 578] (the "Earthquake Stay Motion"). On November 15, 2019, the Debtors and the Committee filed an objection to the Earthquake Stay Motion [Docs. 848, 851]. The Court heard arguments on the Earthquake Stay Motion at the November 22, 2019 hearing and denied the relief requested [Doc. 891].

- On December 12, 2019, the plaintiffs from the Earthquake Stay Motion and other parties filed a motion for relief from the automatic stay to permit continuation of proceedings against the Debtors and other non-debtor parties related to earthquake damages solely against the available insurance proceeds [Doc. 922]. This motion is scheduled to be heard at the January 23, 2020 hearing.

### D. Sale Process

#### 1. *Bid Procedures*

In consultation with their advisors, the Debtors determined that it was in the best interests of the Debtors and their estates to pursue a potential sale of substantially all of the Debtors' assets. To comply with the milestones set forth in the DIP credit facility, on June 11, 2019, the Debtors filed a motion with the Delaware Court seeking approval of, among other things, bid procedures (the "Bid Procedures") for the marketing and potential sale of substantially all of the Debtors' assets [Doc. 63].

On June 21, 2019, the Debtors filed an amended and restated motion [Doc. 86] (the "Bid Procedures Motion") with the Bankruptcy Court seeking approval of, among other things, the Bid Procedures and a potential sale of substantially all of the Debtors' assets.

Five parties-in-interest, including the Committee and certain of the Petitioning Creditors, filed timely objections to the Bid Procedures Motion. Following a contested

25

evidentiary hearing on July 11, 2019, the Bankruptcy Court overruled the objections and entered an order approving the Bid Procedures [Doc. 290].

       2.     <u>Sale Process</u>

The Bid Procedures set forth the requirements and deadlines for potential bidders to submit bids for the Debtors' assets, certain of which were extended to allow potential bidders every opportunity to participate in the sale process, and the terms for an auction of the Debtors' assets. Potential bidders were required to submit preliminary indications of interest by July 17, 2019 (the "<u>Preliminary Bid Deadline</u>") and qualified bids by September 5, 2019 (the "<u>Bid Deadline</u>"). If the Debtors received two or more qualified bids, the Debtors were authorized to conduct an auction (the "<u>Auction</u>") on September 11, 2019. The Debtors were authorized to review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the transaction, and to choose the highest or otherwise best offer(s) (the "<u>Successful Bidder</u>") and alternative next highest or otherwise best offer(s). Additionally, in order to incentivize a bidder to serve as the stalking horse bid, the Bid Procedures permitted the Debtors to offer a potential stalking horse bidder a breakup fee of up to 3.0% of the value of consideration to be paid and expense reimbursement of up to $250,000, subject to objections from the Committee and DIP agent.

Prior to and from the Petition Date to the Bid Deadline, the Debtors, with the assistance of their advisors, engaged in discussions with the interested parties regarding a potential transaction. On the Preliminary Bid Deadline, the Debtors received 11 preliminary bids. Between the Preliminary Bid Deadline and the Bid Deadline, several of the 11 who had submitted preliminary bids indicated they were no longer interested in pursuing a transaction. The Debtors, with the assistance of their advisors, continued to work with all interested parties in preparation for the Bid Deadline and a potential auction.

The Debtors received four bids on the Bid Deadline. The Debtors, with the assistance of their advisors, reviewed the bids and determined that one of the received bids satisfied the requirements of the Bid Procedures to be a "Qualified Bid." The Debtors engaged in extensive discussions with the qualified bidder, BCE-Mach, LLC ("<u>Mach</u>"), to finalize the terms of the proposed sale agreement.

In accordance with the Bid Procedures, three days prior to the Auction, the Debtors, with the assistance of their advisors, distributed to Mach and other parties who submitted bids or who remained interested in the Debtors' assets, copies of the Auction form sale agreement and informed these parties of the Auction procedures. After distribution of these materials, discussions continued with these parties, but no other party besides Mach submitted a Qualified Bid prior to the Auction. The Debtors determined that the bid received from Mach for $115 million was the highest or otherwise best offer and named Mach the Successful Bidder.

       3.     <u>Sale Hearing</u>

On September 12, 2019, the Debtors filed a notice of Successful Bidder, proposed transaction documents and proposed order approving the sale [Doc. 514]. On September 24,

2019 and September 25, 2019, the Debtors filed revised proposed sale orders [Docs. 638, 646]. The hearing to consider the proposed sale of the Debtors' assets to Mach was scheduled for September 26, 2019 (the "Sale Hearing").

The Debtors received three informal objections and 14 formal objections to the Debtors' proposed sale. On the eve of the Sale Hearing, the Debtors received a bid, along with a deposit equal to ten percent of the purchase price, from Contango Oil & Gas Company ("Contango") for $125 million. Upon receipt of Contango's bid, the Debtors engaged in last-minute, robust negotiations with Contango and Mach. These negotiations resulted in Mach raising its bid by $15.5 million, to $130.5 million. The Debtors determined that it was in the best interests of the estates to move forward with, and seek Court approval of, the sale to Mach for $130.5 million at the Sale Hearing.

Upon the announcement of Mach's increased purchase price of $130.5 million at the Sale Hearing, Contango indicated that it was prepared to make a topping bid and conduct an auction at the Sale Hearing. The Sale Hearing was paused and recessed to allow the Debtors and other parties-in-interest to engage in discussions with Mach and Contango. During these negotiations, Contango increased its bid to $132.5 million. The Debtors then, in consultation with the parties-in-interest, established procedures, including bidding increments, for an open auction at the Sale Hearing. Mach indicated that it was not willing to increase its bid any further or engage in an open auction.

Based on this, the Debtors proceeded with the Sale Hearing with Contango as the winning bidder for the Debtors' assets. The Debtors and Contango presented evidence in support of the proposed sale of the Debtors' assets to Contango. At the conclusion of the Sale Hearing, the Bankruptcy Court overruled all unresolved objections and approved the sale of the Debtors' assets to Contango. The Bankruptcy Court entered an order authorizing the sale on September 30, 2019 [Doc. 657] (the "Sale Order").

The sale to Contango was consummated on November 1, 2019 [Doc. 775].

### 4. *De Minimis Sale*

Prior to the Petition Date, the Debtors routinely and in the ordinary course of business sold or, when necessary, otherwise disposed of non-core assets that were obsolete, burdensome or of little or no usable value to the Debtors' estates. One of these assets is the Debtors' leasehold covering the Hoover Formation, Endicott Formation, Tonkawa Formation, Perry Formation, Cottage Grove Formation, Hogshooter, Layton Formation, Cleveland, Big Lime, Prue, Skinner, Red Fork, Bartlesville, Hunton, and Wilcox reservoirs within the AMI identified in the Data License and Purchase Option Agreement, dated as of February 25, 2019, by and between Debtor WSTR and Blue Mtn Exploration, LLC ("Blue Mtn"). The Debtors had identified this prior to the consummation of the Contango Transaction and expressly carved it out from the sale to Contango.

The Debtors filed a motion seeking approval to sell these assets to Blue Mtn for approximately $112,358 [Doc. 898]. The Bankruptcy Court approved the transaction on December 16, 2019 [Doc. 923].

E.    **M&M Liens**

Prior to and following the commencement of these chapter 11 cases, certain of the Debtors' well and service providers (the "M&M Lienholders") have asserted mechanics and materialmen's liens (the "M&M Liens") pursuant to 42 O.S. § 144 over certain of the Debtors' properties, including the Debtors' leaseholds or leases for oil and gas, the buildings and appurtenances on such leaseholds or leases and the proceeds from the sale of oil or gas produced from such leaseholds. Nearly 2,000 M&M Liens have been filed against the Debtors' properties, and 78 different M&M Lienholders have asserted claims (the "M&M Lien Claims") against WSTR and WSTR II seeking secured recoveries on account of these M&M Liens.

1.    *Phillips 66 Adversary*

On August 2, 2019, Phillips 66 Company ("Phillips 66") commenced an adversary proceeding (the "Phillips 66 Adversary") seeking to interplead into the Bankruptcy Court amounts it believes are owed to WSTR under applicable contracts but are subject to M&M Liens (Adv. Pro. No. 19-01072).

Pursuant to the certain oil purchase agreements between WSTR and Phillips 66, in the ordinary course of business, WSTR sold and delivered, and Phillips 66 purchased and received, oil produced by WSTR. However, prior to and following the Petition Date, certain M&M Lien claimants informed Phillips 66 that they asserted M&M Liens against certain of WSTR's properties and demanded that Phillips 66 place all funds attributable to such properties in suspense. Phillips 66 have been holding such funds in suspense rather than remitting such amounts to WSTR. Phillips 66 commenced the Phillips 66 Adversary requesting to interplead such funds into the Bankruptcy Court.

Shebester-Bechtel, Inc. ("SBI"), one of the named defendants in the Phillips 66 Adversary, answered the Phillips 66 complaint and asserted counterclaims, crossclaims and third-party claims. SBI is a vendor to WSTR and asserts that it has valid M&M Liens over WSTR's property, including the funds withheld by Phillips 66. SBI asserts crossclaims against WSTR seeking a determination with respect to the priority, extent and validity of such M&M Liens against WSTR. On October 22, 2019, WSTR answered the Phillips 66 complaint and SBI's crossclaims and third-party claims.

Other defendants in the action similarly filed crossclaims against WSTR that WSTR answered on November 12, 2019.

On October 31, 2019, WSTR and WSTR II filed a motion (the "Stay Motion") seeking entry of an order staying, among others, the Phillips 66 Adversary for a period of 120 days to permit the Turnover Proceeding (as defined below) to advance. The Stay Motion was granted November 25, 2019 [Doc. 890] and the Phillips 66 Adversary is stayed for 120 days until March 24, 2020.

2.    *Baker Hughes Adversary Proceedings*

Between September 9, 2019 and September 18, 2019, M&M Lien claimant Baker Hughes commenced 10 adversary proceedings (the "Baker Hughes Adversary Proceedings")

seeking determinations with respect to the priority, validity and extent of its M&M Liens asserted over 14 wells of WSTR and WSTR II (Adv. Pro. Nos. 19-01083, 19-01084, 19-01085, 19-01086, 19-01087, 19-01089, 19-01090, 19-01091 and 19-01092). Baker Hughes also named as defendants all other working interest owners on the applicable well, other service providers who asserted M&M Liens over the same well and purchasers of oil and gas produced by WSTR and WSTR II from the applicable well.

WSTR and WSTR II answered each of the complaints in the Baker Hughes Adversary Proceedings. The other defendants likewise answered and many also asserted counterclaims and crossclaims. More than 60 crossclaims were filed against WSTR and WSTR II by other defendants. Prior to the Baker Hughes Adversary Proceedings being stayed (discussed below), WSTR and WSTR II had been answering these crossclaims as they become due and they will continue to do so at the appropriate time with respect to the remainder. Additionally, in late October 2019, Baker Hughes served WSTR and WSTR II with early discovery containing more than 50 interrogatories and over 250 document requests.

On October 31, 2019, WSTR and WSTR II filed the Stay Motion seeking entry of an order staying each of the Baker Hughes Adversary Proceedings for a period of 120 days to permit the M&M Lien Proceeding (as defined below) to advance. The Stay Motion was granted November 25, 2019 [Doc. 890] and the Baker Hughes Adversary Proceedings are stayed for 120 days until March 24, 2020.

### 3.    *M&M Lien Reserve*

Upon the consummation of the sale to Contango and pursuant to the Sale Order, the Debtors established a reserve (the "M&M Lien Reserve") for distribution on account of allowed M&M Lien Claims secured by M&M Liens. The M&M Liens attached to the funds in the M&M Lien Reserve in the order of their priority, with the same validity, force and effect that they had against the Debtors' applicable assets, and are subject to any liens, rights, claims and defenses of the Debtors, DIP lenders or RBL Lenders.

The M&M Lien Reserve was funded with the proceeds from the Contango transaction in an amount equal to the sum of (a) for each allowed M&M Lien Claim, the amount of such allowed M&M Lien Claim that has not been paid or otherwise satisfied and (b) for each M&M Lien Claim asserted in a valid and timely proof of claim and not allowed, the lesser of (i) the amount asserted in such proof of claim and (ii) the amount estimated pursuant to the Bankruptcy Code or otherwise ordered by the Bankruptcy Court.

On October 28, 2019, the Debtors filed a lien schedule identifying the M&M Lien Claims that the Debtors propose shall comprise the M&M Lien Reserve [Doc. 744]. The schedule included the name of each M&M Lienholder and the amount of each M&M Lien for such lienholder. After the filing, the Debtors received a number of inquiries from M&M Lienholders regarding omissions or objections to the lien schedule. The Debtors filed a revised lien schedule on October 31, 2019 reflecting changes as agreed to with these M&M Lienholders [Doc. 763]. The Debtors continued to receive formal and informal inquiries and objections to the revised lien schedule and filed further revised lien schedules on November 20, 2019

[Doc. 869] and November 21, 2019 [Doc. 879], which resolved all outstanding formal and informal objections.

The M&M Lien Reserve does not determine the validity, priority or extent of the M&M Liens or the allowance of the M&M Lien Claims. The Debtors commenced the M&M Lien Proceeding to adjudicate the validity, priority and extent of the M&M Liens. After adjudication of such issues, the applicable M&M Lien Claims will be reconciled through the Debtors' claims process. M&M Lienholders whose (a) M&M Liens are determined to be valid and have priority and (b) M&M Liens Claims are allowed will be entitled to receive distribution from the M&M Lien Reserve. The M&M Lien is currently funded in the amount of $28.536 million.

    *4.*    *M&M Lien Proceeding and Related Adversary Proceeding Procedures*

On October 31, 2019, WSTR and WSTR II commenced an adversary proceeding (the "<u>M&M Lien Proceeding</u>") to determine the validity, extent and priority of all M&M Liens asserted against WSTR and WSTR II and their properties. Specifically, WSTR and WSTR II are seeking declaratory judgment determining (a) which of the M&M Liens are senior in priority to the liens securing the facility under the RBL Credit Agreement (the "<u>RBL Liens</u>") on the same property, (b) which of the M&M Liens are junior in priority to the corresponding RBL Liens on the same property, (c) which of the M&M Liens are invalid for failure to comply with Oklahoma law and (d) that the secured M&M Lien Claim recovery on account of any of the M&M Liens is limited to the net purchase price (net of suspense) allocated by Contango for each property.

In connection with the M&M Lien Proceeding, WSTR and WSTR II filed a motion seeking to establish procedures to govern the M&M Lien Proceeding. These proposed procedures provide for:

- A 90-day initial period from the filing of the WSTR and WSTR II complaint to permit WSTR and WSTR II to seek partial summary judgment on certain common threshold legal issues, on notice to all defendants;

- Following the 90-day initial period and adjudication of the threshold legal issues, a 60-day settlement period to permit the Debtors and their stakeholders to explore resolution of individual M&M Lien Claims;

- Streamlined settlement approval procedures to permit consensual resolution of M&M Lien Claims;

- Extension of certain litigation deadlines, including the time for responding to the complaint and discovery, until after the 90-day initial period and 60-day settlement period have ended and

- Litigation of any remaining individual issues necessary to resolve M&M Lien Claims either through the M&M Lien Proceeding or a duly filed claim objection.

SC1:5119879.1

A number of parties filed objections to the proposed procedures. After a contested hearing on November 22, 2019, the Court overruled all of the objections and approved the proposed procedures [Case No. 19-01115, Doc. 233] (the "Adversary Procedures Order").

In accordance with the Adversary Procedures Order, WSTR and WSTR II filed a motion for partial summary judgment on December 16, 2019 [Case No. 19-01115, Doc. 276] (the "M&M Lien Summary Judgment Motion"). As provided in the Adversary Procedures Order, objections to the M&M Lien Summary Judgment Motion are due January 8, 2020 and replies are due January 27, 2020. Pursuant to an consensual order, the deadline to object to the M&M Lien Summary Judgment Motion was extended to January 15, 2020 and the deadline to reply to such objections was extended to February 3, 2020 [Case No. 19-01115, Doc. 284]. The hearing on the M&M Lien Summary Judgment Motion is set for February 13, 2020.

>    5.    *Turnover Proceeding*

On October 31, 2019, WSTR and WSTR II also commenced an adversary proceeding (the "Turnover Proceeding") seeking the turnover, pursuant to section 542 of the Bankruptcy Code, of more than $1.75 million of funds due and owing from five purchasers of oil and gas pursuant to valid and binding contracts. WSTR and WSTR II assert that these defendants have been improperly withholding such amounts following improper demands for payment from certain holders of M&M Liens asserting liens over the funds.

On December 16, 2020, WSTR and WSTR II filed a motion for partial summary judgment in the Turnover Proceeding [Case No. 19-01116, Doc. 95] (the "Turnover Summary Judgment Motion"). The Turnover Summary Judgment Motion and the M&M Lien Summary Judgment Motion raise similar arguments with respect to 42 O.S. § 144.2. The hearing on the Turnover Summary Judgment is set for the same hearing as the M&M Lien Summary Judgment Motion, on February 13, 2020. On December 18, 2019, WSTR and WSTR II filed a motion seeking to establish a briefing schedule with respect to the Turnover Summary Judgment Motion [Case No. 19-01116, Doc. 143]. WSTR and WSTR II's scheduling motion was granted and objections to the Turnover Summary Judgment Motion are due January 15, 2020 and replies are due February 3, 2020 [Case No. 19-01116, Doc. 158].

>    6.    *Stay Motion*

Simultaneous to the commencement of the M&M Lien Proceeding and the Turnover Proceeding, WSTR and WSTR II also filed the Stay Motion. The Stay Motion seeks to stay the Phillips 66 Adversary and the Baker Hughes Adversary Proceedings for an initial period of 120 days.

This stay is intended to permit the parties and the Bankruptcy Court to focus on the common legal issues that permeate through the Baker Hughes Adversary Proceedings and Phillips 66 Adversary, but also impact many other parties-in-interest and are now before the court in the M&M Lien Proceeding and the Turnover Proceeding. The M&M Lien Proceeding and Turnover Proceeding will permit an orderly adjudication of issues actually necessary to be decided in order to administer these chapter 11 cases and bring them to a successful conclusion in a reasonable time frame.

A number of parties filed objections to the Stay Motion.  After a contested hearing on November 22, 2019, the Court overruled all of the objections and approved the Stay Motion [Doc. 890].

### F.    Committee's Investigation and Litigation

#### 1.    *The Rule 2004 Motion*

On July 9, 2019, the Committee filed a motion (the "Rule 2004 Motion") requesting entry of an order compelling the Debtors to appear for examination with respect to 14 topics and to produce documents relating to 32 topics.  The Rule 2004 Motion also requested permission to subpoena the Debtors' former chief financial officer.

The Debtors' counsel met and conferred with the Committee's counsel to discuss the scope of the Committee's requests.  Following extensive good faith negotiations, the Debtors agreed to produce documents responsive to a number of the Committee's document requests, primarily related to the Committee's stated priorities of investigating the validity, perfection and enforceability of the RBL Liens and to assert a challenge during the time period permitted under the Final DIP Order.

The Debtors made two formal productions to the Committee, consisting of more than 8,000 pages of documents in response to the agreed-upon searches.  In addition, the Debtors coordinated with A&M to continuously provide responses to various informal discovery requests by the Committee.

On October 16, 2019, the Bankruptcy Court entered an agreed order with respect to the outstanding requests under the Rule 2004 Motion (the "Rule 2004 Order") [Doc. 704].  Pursuant to the Rule 2004 Order, the Committee was given authority to conduct an investigation of potential claims or causes of action that may be asserted by the estate in relation to (a) any potential claims or causes of action the estate may have against its officers and directors relating to any prepetition transactions and/or the events that led to the Debtors' bankruptcy filing and (b) avoidance or other causes of action relating to prepetition transactions by the Debtors.  The Rule 2004 Order also authorizes the Committee to issue deposition subpoenas and subpoenas to the Debtors and their current and former officers, directors and employees for the production of documents responsive to the examination topics.

#### 2.    *The Committee's Litigation Against the RBL Agent*

Pursuant to the terms of the Final DIP Order, the Committee was granted standing to file an adversary proceeding to challenge the validity, enforceability, priority or extent of any obligations arising under the RBL Credit Agreement and the liens on the prepetition collateral securing such obligations.

Since early in these chapter 11 cases, the Committee, the Debtors, and the RBL Agent have actively engaged in a process that permitted the Committee to investigate the merits of the RBL Secured Claims and potential affirmative claims and causes of action against the RBL Agent, including those the Committee ultimately asserted in the Committee Adversary Proceeding, commenced on September 9, 2019 (Adv. Pro. No. 19-01088).  In its complaint, the

Committee alleged (a) breach of good faith and fair dealing, (b) declaratory judgment that certain unperfected assets are not subject to liens and security interests, (c) avoidance of liens on unperfected assets, (d) avoidance of certain preferential transfers, (e) recovery of claims pursuant to section 550 of the Bankruptcy Code, and (f) disallowance of claims pursuant to section 502(b) of the Bankruptcy Code.

By agreement of the parties, the time to respond to the Committee's complaint was extended by two weeks. On October 25, 2019, the RBL Agent answered the Committee's complaint and filed a motion to dismiss. By further agreement of the parties, the Committee's time to respond to the motion to dismiss was extended to December 2, 2019 and further extended to February 17, 2020.

Soon after the Committee Adversary Proceeding was commenced, on November 1, 2019, the Debtors closed the sale of substantially all of their assets to Contango for $132.5 million. This left the Debtors with limited assets that included certain potential litigation claims against third parties and the cash proceeds of the Sale that were subject to the liens of the RBL Agent being challenged in the Committee Adversary Proceeding. Further, the Sale resulted in the RBL Agent having a large deficiency claim. This deficiency claim, which exceeded $200 million, could dilute recoveries for all other general unsecured creditors. The Committee, however, continued its discovery on its claims against the RBL Agent while simultaneously analyzing the value of the potentially unencumbered sale proceeds, the delay, cost and risk of litigation against the RBL Agent, the value of the remaining potential litigation claims and the impact of the RBL Agent's deficiency claim on net recoveries to other general unsecured creditors.

After an extensive negotiation, the Committee and the RBL Agent reached a settlement of the Committee Adversary Proceeding that is to be consummated through the Plan (the "Settlement"). The Settlement classifies the RBL Agent's deficiency claim in Class 3 (RBL Secured Claims) separately from all other general unsecured claims that reside in Class 4 (General Unsecured Claims). It further establishes and funds a Litigation Trust established for the purpose of pursuing litigation assets for distribution to unsecured creditors. The Litigation Trust will be vested with (a) $1.25 million from the proceeds of the Sale to fund distributions to Class 4 and the expenses of the Litigation Trust, (b) causes of action against the Debtors' current and former directors and officers (subject to certain limitations set forth in the Plan), (c) the right to proceeds of the Debtors' insurance policies providing director and officer liability coverage, and (d) causes of action against all third parties arising under chapter 5 of the Bankruptcy Code. Subject to certain express requirements set forth in the Plan and the ballots and other solicitation materials that accompany the Plan, at the direction of the RBL Agent, preference claims arising under section 547 of the Bankruptcy Code against qualifying trade creditors will not be pursued by the Litigation Trustee. Other preference claims and other causes of action against third parties may be pursued by the Litigation Trustee.

Of the $1.25 million in initial funding for the Litigation Trust, $400,000 will be earmarked for distribution for Class 4 (General Unsecured Claims). The remaining $850,000 will be used to pay administrative expenses of the Litigation Trust/Litigation Trustee, including its advisors and any contingency or other fees and expenses of outside counsel. Litigation proceeds obtained by the Litigation Trustee will first be used to reimburse up to $850,000 of the

SC1:5119879.1

administrative expenses incurred by the Litigation Trust so that such amount can be used to distribute to Class 4. Any additional proceeds will be distributable 50% to Class 3 and 50% to Class 4.

Because the Plan has yet to be solicited or confirmed, the Committee Adversary Proceeding has been effectively stayed and will not be deemed dismissed until the Plan is confirmed and is effective. If that does not occur on the timeline described in this Disclosure Statement, the Settlement may be revoked and the litigation between the Committee and the RBL Agent may be reactivated.

## 4.    SUMMARY OF THE PLAN

The Plan provides for the distribution of the proceeds of the Sale. The structure of the Plan is informed by the Debtors' expectation that the substantial majority of Claims asserted against the Debtors will be classified into one of three categories: (a) RBL Secured Claims, comprised of all claims arising under the RBL Credit Agreement; (b) Other Secured Claims, comprised mainly of Statutory Lien Claims secured by liens that, under Oklahoma law, have priority over the liens securing the RBL Secured Claims and (c) General Unsecured Claims, comprised of trade claims, Statutory Lien Claims secured by liens that, under Oklahoma law, are junior to the liens securing the RBL Secured Claims and EnLink's claims under the Term Loan that were rendered unsecured as a result of the Sale realizing insufficient proceeds to satisfy the RBL Secured Claims that are senior to EnLink's junior liens.

On the Effective Date, the Litigation Trust will be established and will be vested with the Avoidance Actions and the Prepetition D&O Actions, with any recovery on such D&O actions limited to the Debtors' available D&O Policies. The Debtors have identified certain preference claims against trade creditors that may be colorable but these claims are expected to be released by the Litigation Trustee at the direction of the RBL Agent in connection with the Settlement. The Litigation Trustee has not conducted a thorough investigation of the Avoidance Actions and Prepetition D&O Actions and, accordingly, there can be no guarantee of any recovery from the Litigation Trust Distributable Cash.

The Plan provides that all Other Secured Claims will be paid in full or otherwise unimpaired. Holders of Allowed General Unsecured Claims, other than Holders of RBL Deficiency Claims, will receive their Pro Rata share of the Unsecured Claim Pool, and if Litigation Trust Distributable Cash is available for Distribution, Holder of Allowed General Unsecured Claims, other than Holders of RBL Deficiency Claims, will receive their Pro Rata share of 50% of Litigation Trust Distributable Cash and Holders of RBL Deficiency Claims will receive their Pro Rata share of 50% of Litigation Trust Distributable Cash. Holders of RBL Secured Claims will receive their Pro Rata share of the RBL Secured Claim Distribution. The costs and expenses of administering the Plan after the Effective Date will be funded by the Residual Cash Proceeds.

The classification, treatment and voting of Claims and Equity Interests and settlement, release, injunction and related provisions are summarized below. For all other provisions relating to the Plan, including implementation of the Plan; treatment of Executory Contracts and Unexpired Leases; conditions precedent to effectiveness of the Plan; modification,

revocation or withdrawal of the Plan and retention of jurisdiction, please refer to the Plan attached hereto as <u>Appendix A</u>.

### A. Classification, Treatment and Voting of Claims and Equity Interests

#### 1. *Classification of Claims and Equity Interests*

All Claims and Equity Interests except for Administrative Claims and Professional Claims are classified in the Classes set forth in Article 4 of the Plan. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is Allowed as a Claim or Equity Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

    a. <u>Deemed Substantive Consolidation</u>. The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including Voting, Confirmation and Distribution (but for the avoidance of doubt, without altering the separate Petition Dates for certain Debtors). As a result of the deemed substantive consolidation of the Estates, each Class of Claims and Equity Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors. The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

    b. <u>Summary of Classification and Treatment</u>. The classification of Claims and Equity Interests pursuant to the Plan is as follows:

| Class | Claims and Equity Interests | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | RBL Secured Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Equity Interests in Holdings | Impaired | Deemed to Reject |

#### 2. *Treatment of Claims and Equity Interests*

<u>Class 1 – Other Priority Claims</u>

(a) *Classification*: Class 1 consists of all Other Priority Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court.

(c)     *Voting*:  Claims in Class 1 are Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Priority Claims is entitled to vote to accept or reject the Plan.

Class 2 – Other Secured Claims

(a)     *Classification*:  Class 2 consists of Other Secured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Administrator:  (i) payment in full in Cash; (ii) delivery of the collateral securing such Allowed Other Secured Claim or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired.

(c)     *Voting*:  Claims in Class 2 are Unimpaired.  Each Holder of an Other Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an Other Secured Claim is entitled to vote to accept or reject the Plan.

Class 3 – RBL Secured Claims

(a)     *Classification*:  Class 3 consists of all RBL Secured Claims.

(b)     *Allowance*:  The RBL Secured Claims shall be Allowed in an aggregate amount equal to $280,221,539.08, representing principal and accrued and unpaid interest at the non-default contractual rate up to and including the Holdings Petition Date.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed RBL Secured Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in

36

exchange for its Allowed RBL Secured Claim, each Holder of an Allowed RBL Secured Claim shall receive its Pro Rata share of the RBL Secured Claim Distribution, until such time as such Holder has received Cash distributions equal to the Allowed amount of such Allowed RBL Secured Claim.

(d)    *Voting*:  Claims in Class 3 are Impaired and each Holder of an RBL Secured Claim is entitled to vote to accept or reject the Plan.

Class 4 – General Unsecured Claims

(a)    *Classification*:  Class 4 consists of all General Unsecured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable treatment, and in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Unsecured Claim:

   (i)    each Holder of an Allowed General Unsecured Claim, other than a Holder of an RBL Deficiency Claim, shall receive its Pro Rata share of the Unsecured Claim Pool; and

   (ii)    if Litigation Trust Distributable Cash is available for Distribution, each Holder of an Allowed General Unsecured Claim, other than a Holder of an RBL Deficiency Claim, shall receive its Pro Rata share of 50% of Litigation Trust Distributable Cash and each Holder of an RBL Deficiency Claim shall receive its Pro Rata share of 50% of Litigation Trust Distributable Cash.

(c)    *Voting*:  Claims in Class 4 are Impaired and each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

Class 5 – Equity Interests in Holdings

(a)    *Classification*:  Class 5 consists of all Equity Interests in Holdings.

(b)    *Treatment*:  No Holder of an Equity Interest in Holdings shall receive any Distributions on account of its Equity Interest.  On and after the Effective Date, all Equity Interests in Holdings shall be canceled and shall be of no further force and effect, whether surrendered for cancelation or otherwise.

(c)    *Voting*:  Claims in Class 5 are Impaired.  Each Holder of an Equity Interest in Holdings is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No

37

Holder of an Equity Interest in Holdings is entitled to vote to accept or reject the Plan.

3. *Intercompany Claims and Interests*

Notwithstanding anything in the Plan to the contrary, on the Effective Date or as soon thereafter as is reasonably practicable all Intercompany Claims and Intercompany Interests will be canceled and discharged in full, and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan. In no event shall Intercompany Claims be allowed as General Unsecured Claims or entitled to any Distribution under the Plan.

4. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, the Plan shall not affect the Debtors' or the Plan Administrator's rights in respect of any Unimpaired Claims, including legal and equitable defenses or setoff or recoupment rights with respect thereto.

5. *Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code*

For purposes of Confirmation, section 1129(a)(10) of the Bankruptcy Code shall be satisfied if any one of Classes 3 or 4 accepts the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class or Classes of Claims.

**B.    Implementation of the Plan**

1. *Operations Between the Confirmation Date and Effective Date*

During the period from the Confirmation Date through and until the Effective Date, the Debtors may continue to operate their businesses as debtors-in-possession, subject to all applicable orders of the Bankruptcy Court.

2. *Settlement of Committee Adversary Proceeding*

Other than as specifically set forth in the Plan, the Plan shall be deemed a motion to approve the good-faith compromise and settlement of the Committee Adversary Proceeding pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

On the Effective Date, the transactions contemplated by the Plan, including the Distributions to Holders of Allowed General Unsecured Claims, the acknowledgement of the adequate protection claim of the Holders of the RBL Secured Claims and the direction to the Litigation Trustee not to pursue certain Preserved Potential Claims pursuant to Article 5.4.6 of the Plan, shall be in full and final settlement of the Committee Adversary Proceeding, and the

Committee Adversary Proceeding shall be deemed dismissed with prejudice. The Committee and the RBL Agent shall file a joint notice of dismissal with the Bankruptcy Court.

### 3. *Wind Down Estates*

The purpose of the Wind Down Estates is to monetize and distribute the Plan Assets with no objective to continue or engage in the conduct of a trade or business. The Plan Administrator shall be vested with all powers and authority set forth in this Plan, shall be deemed to have been appointed as the Debtors' Estates' representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, and shall have the duties of a trustee set forth in sections 704(a)(1), 704(a)(2) and 704(a)(5) of the Bankruptcy Code.

### 4. *Litigation Trust*

a.  <u>Establishment of Litigation Trust.</u> On or before the Effective Date, the Debtors, on their own behalf and on behalf of the beneficiaries, the Committee and the Litigation Trustee shall execute the Litigation Trust Agreement and take all necessary steps to establish the Litigation Trust. The Litigation Trust shall be established for the primary purpose of receiving the Litigation Trust Assets and maximizing the net present value of Distributions to Holders of Allowed General Unsecured Claims, with no objective to continue or engage in the conduct of a trade or business. The Litigation Trustee shall be a disinterested fiduciary with duties solely to the Holders of Allowed General Unsecured Claims. The establishment of the Litigation Trust is not a determination that any Preserved Potential Claims are colorable or valuable. The Litigation Trustee shall have no duty to bring any litigation and may decline to pursue any litigation as and to the extent it determines is in the best interests of the Holders of Allowed General Unsecured Claims. The Litigation Trustee shall have the authority to retain any advisors for the purpose of carrying out its duties under the Litigation Trust Agreement, and shall be vested with all powers and authorities set forth in this Plan and the Litigation Trust Agreement.

b.  <u>Funding of Litigation Trust.</u> On the Effective Date, the Litigation Trust shall be funded with the Litigation Trust Funding Amount.

c.  <u>Litigation Trust Reserve Amount and Litigation Trust Reimbursement Amount.</u>

1.  On the Effective Date, the Litigation Trust shall create a reserve account that shall be funded with the Litigation Trust Reserve Amount. The initial reasonable costs and expenses of the Litigation Trust shall be funded out of the Litigation Trust Reserve Amount, excluding any contingency fees of counsel which shall be funded out of the proceeds of any Preserved Potential Claims for which the contingency fees are earned. Net

Recoveries on Preserved Potential Claims in an amount equal to the Litigation Trust Reserve Amount (the "Litigation Trust Reimbursement Amount") shall be contributed to the Unsecured Claim Pool from the first Net Recoveries.

2. Reserve Amount remains, upon dissolution of the Litigation Trust, any such excess funds shall be treated as follows: (i) to the extent that such funds have been reimbursed to the Unsecured Claim Pool by application of the Litigation Trust Reimbursement Amount, such funds shall be treated as Litigation Trust Distributable Cash; and (ii) to the extent that such funds have not been reimbursed to the Unsecured Claim Pool by application of the Litigation Trust Reimbursement Amount, such funds shall be treated as part of the Unsecured Claim Pool.

d. <u>Taxation of Litigation Trust.</u> The Litigation Trust will be designed and intended to meet the criteria set out in Rev. Procedure 94-45 for qualifying as a grantor trust for United States tax purposes. Accordingly, both the Litigation Trustee and relevant Holders shall, for United States tax purposes, treat Holders of the Allowed General Unsecured Claims as receiving all of the assets of the Litigation Trust on the Effective Date in exchange for their Allowed General Unsecured Claims and thereafter (a) earning all items of interest or other income earned by the Litigation Trust and (b) incurring any expenses or losses incurred by the Litigation Trust. The Litigation Trustee shall file grantor trust tax returns for the Litigation Trust in accordance with the above and send Holders of Allowed General Unsecured Claims appropriate statements regarding their allocable shares of the income, expense or loss referenced above.

e. <u>Books and Records.</u> The Litigation Trust shall have access to the Debtors' books and records for the purpose of investigating and pursuing the Preserved Potential Claims. The Confirmation Order shall provide that, on the Effective Date, all of the Debtors' privileges and work product, including but not limited to, any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral) related to the Preserved Potential Claims that vest in the Litigation Trust, shall be vested in the Litigation Trust, which will have exclusive authority to waive or not to waive the Debtors' privileges in its sole discretion. Notwithstanding the foregoing and for the avoidance of doubt, the privileges transferred to the Litigation Trust do not include any privileges of the current and former individual directors or officers of the Debtors, and all of the rights of such directors and officers with respect to such privileged

SC1:5119879.1

materials, including any materials that may be subject to joint privilege with the Debtors, are hereby preserved.

f. <u>Vendor Actions.</u>  As part of the settlement of the Committee Adversary Proceeding, and solely to the extent that such settlement is approved by the Bankruptcy Court pursuant to this Plan, the Committee and the RBL Agent have agreed that the Holders of RBL Secured Claims hold an Allowed adequate protection claim pursuant to the Final DIP Order in an amount in excess of the potential net value to the Estates of all Vendor Actions, and the Holders of RBL Secured Claims have agreed to forego recovery relating to Vendor Actions. The Litigation Trust Agreement shall therefore (i) provide that the RBL Agent has the sole authority to direct the Litigation Trustee with respect to the Vendor Actions, and (ii) include an irrevocable direction from the RBL Agent on behalf of the Holders of RBL Secured Claims to the Litigation Trustee not to pursue recovery on any of the Vendor Actions where the applicable vendor or trade creditor (a) does not vote to reject the Plan and (b) refrains from filing or otherwise asserting with the Court a substantive objection to the Plan that is not consensually withdrawn by no later than the commencement of the Confirmation Hearing; *provided*, *however*, that any objection filed that relates solely to the treatment of claims in Class 2 of the Plan shall not qualify as a "substantive objection" pursuant to this provision.  The Litigation Trust Agreement shall further provide that if a vendor or trade creditor so files or asserts such an objection, such irrevocable direction by the RBL Agent shall not apply to the objecting vendor or trade creditor.

5. *Vesting of Assets*

a. <u>Wind Down Estates Assets.</u>  As of the Effective Date, all Plan Assets shall vest in the Wind Down Estates free and clear of all Liens, Claims, charges or other encumbrances or interests to the extent permitted by section 1141 of the Bankruptcy Code.

b. <u>Litigation Trust Assets.</u>  As of the Effective Date, the Litigation Trust Assets and the Debtors' rights, title and interests to such Litigation Trust Assets shall vest in the Litigation Trust free and clear of all Liens, Claims, charges or other encumbrances or interests to the extent permitted by section 1141 of the Bankruptcy Code; *provided, however* that the Litigation Trust Assets and the Debtors' rights, title and interests to such Litigation Trust Assets may not be transferred or assigned by the Litigation Trust to any party.

6. *D&O Policies.*

As of the Effective Date, the Debtors shall be deemed to have assumed all of the Debtors' D&O Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code, and

41

coverage for defense and indemnity under any of the D&O Policies shall remain available within the definition of "Insured" in any of the D&O Policies subject to the terms and conditions of the D&O Policies.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each D&O Policy.  Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in an order of the Bankruptcy Court, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Policies, and each such obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.  For the avoidance of doubt, the D&O Policies (i) are prefunded and will not require any additional premiums on or after the Effective Date and (ii) provide coverage for those insureds currently covered by such policies for the remaining term of such policies and runoff or tail coverage after the Effective Date to the fullest extent permitted by such policies.

### 7.    _Cancellation of Existing Agreements, Notes and Equity Interests_

On the Effective Date, except as otherwise specifically provided for in the Plan, the DIP Credit Agreement, RBL Credit Agreement, Enlink Credit Agreement, Unsecured Notes Indenture and any other Certificate, Equity Interest, share, note, bond, indenture, purchase right, option, warrant, intercreditor agreement, guaranty, indemnity, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Equity Interest, shall be canceled, and the Debtors and their Affiliates shall not have any obligations thereunder and shall be released and discharged therefrom.

### 8.    _Section 1146 Exemption from Certain Transfer Taxes and Recording Fees_

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers from the Debtors to the Wind Down Estates or to any other Person, pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to: (a) the distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (b) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, sales and use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment.  The Bankruptcy Court shall retain specific jurisdiction with respect to these matters.

42

9.    *Preservation of Causes of Action*

Except as otherwise provided in Article 10 of the Plan or the other provisions of the Plan, each Cause of Action of a Debtor shall be preserved and, along with the exclusive right to enforce such Cause of Action, shall vest exclusively in the Wind Down Estates or the Litigation Trust, as applicable, as of the Effective Date.  Unless a Cause of Action is expressly waived, relinquished, released or compromised in the Plan or an order of the Bankruptcy Court, the Plan Administrator or Litigation Trustee, as applicable, expressly reserves such Cause of Action for later adjudication and, accordingly, no doctrine of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of the Confirmation, the Plan, the vesting of such Cause of Action in the Wind Down Estates or Litigation Trust, as applicable, any order of the Bankruptcy Court or these Chapter 11 Cases.  **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as an indication that the Debtors, the Plan Administrator or the Litigation Trustee, as applicable, will not pursue such Cause of Action.**

10.    *Effectuating Documents and Further Transactions*

The Debtors, the Plan Administrator or the Litigation Trustee, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable law, and without any requirement of further action by the shareholders, directors, managers or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

**C.    Provisions Governing Distributions**

1.    *Distributions on the Initial Distribution Date*

a.    Initial Distributions Generally.  On the Initial Distribution Date, the Distribution Agent shall commence Distributions under the Plan on account of each Claim that is Allowed on or prior to the Effective Date, other than General Unsecured Claims.

b.    Initial Distributions to RBL.  On the Initial Distribution Date, the Distribution Agent shall Distribute to the Holders of RBL Secured Claims, in accordance with Article 4.2.3 of the Plan, the funds in the RBL Initial Claim Pool.

c.    Initial Distributions to General Unsecured Creditors.  On the Initial Distribution Date, the Litigation Trustee shall Distribute the Unsecured

43

Claim Pool net of the Unsecured Claim Pool Reserve to Holders of Allowed General Unsecured Claims, other than the Holders of the RBL Deficiency Claim.

2.    *Distributions on Subsequent Distribution Dates*

a.    Subsequent Distribution Dates.  Other than with respect to Distributions to Holders of Allowed General Unsecured Claims, the Plan Administrator shall identify periodic dates after the Initial Distribution Date to be Subsequent Distribution Dates for purposes of making additional Distributions under the Plan.  Each Subsequent Distribution Date shall be a Business Day, and the period between any Subsequent Distribution Date and the prior Distribution Date shall not exceed 180 days.

b.    Subsequent Distributions to RBL.

1.    Distribution of Excess M&M Lien Reserve.  If, on any Subsequent Distribution Date, the amount of Cash held in the M&M Lien Reserve is greater than the M&M Lien Reserve Amount, the Plan Administrator shall direct the Distribution Agent to Distribute the M&M Lien Reserve Residual to the Holders of RBL Secured Claims in accordance with Article 4.2.3 of the Plan.

2.    Distributions of RBL Allocation of Wind Down Cash Proceeds. On any Subsequent Distribution Date, the Plan Administrator may direct the Distribution Agent to Distribute the Wind Down Cash Proceeds that the Plan Administrator, in its sole discretion, determines are Wind Down Cash Proceeds to the Holders of RBL Secured Claims in accordance with Article 4.2.3 of the Plan.

3.    Final Distribution at Closing of the Cases.  On or prior to the closing of the Chapter 11 Cases, the Plan Administrator shall Distribute all remaining Wind Down Cash Proceeds to the Holders of RBL Secured Claims in accordance with Article 4.2.3 of the Plan.

c.    Subsequent Distributions of Holders of Allowed General Unsecured Claims.  The Litigation Trustee may commence Distribution of subsequently available portions of the Unsecured Claim Pool to Holders of Allowed General Unsecured Claims, other than Holders of the RBL Deficiency Claim, and Litigation Trust Distributable Cash to Holders of Allowed General Unsecured Claims and Holders of RBL Deficiency Claims at any time after the Effective Date in its sole discretion.  If, the Litigation Trustee directs the Distribution Agent to

44

Distribute Cash to Holders of Allowed General Unsecured from either (a) the Unsecured Claim Pool Reserve, including because a Claim for which Distributions have been held has been finally disallowed, resolved for a lesser amount than had been reserved with respect to such claim, or determined to be a General Unsecured Claim or Other Secured Claim, as applicable, or (b) the Litigation Trust Distributable Cash, the Distribution Agent shall make an additional Distribution to each Holder of an Allowed General Unsecured Claim, other than a Holder of an RBL Deficiency Claim, in accordance with Article 4.2.4 of the Plan.

d.  <u>Distributions to Holders of Claims Allowed After the Effective Date.</u> Except with respect to Distributions to Holders of Allowed General Unsecured Claims, the Distribution Agent shall make Distributions to Holders of Claims Allowed after the Effective Date in accordance with the applicable provision of Article 4 of the Plan on the first Subsequent Distribution Date after such Claim is Allowed.  Unless the Plan Administrator or the Litigation Trustee, as applicable, otherwise agrees, no partial Distribution shall be made with respect to such Claim until all disputes in connection with such Claim have been resolved by Final Order of the Bankruptcy Court.

*3.*    *Record Date and Delivery of Distributions*

a.  <u>Record Date for Distributions.</u>  On the Distributions Record Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distributions Record Date.  If a Claim is transferred 20 or fewer days before the Distributions Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

b.  <u>Delivery of Distributions in General.</u>  Except as otherwise provided in the Plan, the Distribution Agent, at the direction of the Plan Administrator or the Litigation Trustee, as applicable, shall make all Distributions required under the Plan to Holders of Allowed Claims. Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, Distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distributions Record Date by the Distribution Agent, as appropriate: (a) to the signatory set forth on any of the Proofs of Claim filed by such Holder or other representative identified therein (or at the last known address of such Holder if no Proof of Claim is filed or if the Debtors, the Plan Administrator, the Litigation Trustee or the Distribution Agent have

45

been notified in writing of a change of address); (b) at the address set forth in any written notice of change of address delivered to the Notice and Claims Agent or (c) at the address reflected in the Schedules if no Proof of Claim has been filed and the Notice and Claims Agent has not received a written notice of a change of address. The Debtors, the Plan Administrator, the Litigation Trustee, the Distribution Agent and the Notice and Claims Agent shall not incur any liability whatsoever on account of the delivery of any Distributions under the Plan.

c.   Delivery of Distributions to DIP Claims and RBL Secured Claims. To the extent the DIP Claims have not been paid or otherwise satisfied prior to the Effective Date, the DIP Agent shall be deemed to be the holder of all DIP Claims and the RBL Agent shall be deemed to be the holder of all RBL Secured Claims. All Distributions on account of such claims shall be made to or on behalf of the DIP Agent or the RBL Agent, as applicable. The DIP Agent or the RBL Agent, as applicable, shall hold or direct such Distributions for the benefit of the holders of such claims. As soon as practicable following compliance with the other requirements set forth in Article 7 of the Plan, the DIP Agent or the RBL Agent, as applicable, shall arrange to deliver such Distributions to, or on behalf of, the holders of such claims. Any such Distributions that are Unclaimed Distributions for a period of six months shall be deemed unclaimed property and shall vest in the Wind Down Estates in accordance with Article 7.6 of the Plan. The Agents shall promptly report to the Plan Administrator or Distribution Agent, as applicable, any Unclaimed Distributions six months after receipt of any Distribution. For the avoidance of doubt, the Agents shall only be required to act to make Distributions in accordance with the terms of the Plan. The Plan Administrator's obligations to make Distributions to the Holders of the DIP Claims, if the DIP Claims have not been paid or otherwise satisfied prior to the Effective Date, and RBL Secured Claims in accordance with this Plan shall be deemed satisfied upon delivery of Distributions to the DIP Agent or RBL Agent, as applicable, or if the consent of an Agent is given, to the Distribution Agent on behalf of that Agent, as provided for in the Plan.

d.   Foreign Currency Exchange Rate. Except as otherwise provided in the Plan, an order of the Bankruptcy Court or as agreed to by the Holder and the Debtors or the Plan Administrator, as applicable, any Claim asserted in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollars at the Exchange Rate.

4.   *Distribution Agents*

The Plan Administrator and the Litigation Trustee, as applicable, shall have the authority, each in its sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the Distributions required hereunder. To the extent the Plan Administrator or

46

the Litigation Trustee determines to utilize a Distribution Agent to facilitate the Distributions, such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or Distributions required under the Plan and (c) waive any right or ability to set off, deduct from or assert any Lien or other encumbrance against the Distributions required under the Plan to be distributed by such Distribution Agent.

The Plan Administrator or the Litigation Trustee, as applicable, shall pay to the Distribution Agents all of their reasonable and documented fees and expenses without the need for any approvals, authorizations, actions or consents of the Bankruptcy Court or otherwise. The Distribution Agents shall submit detailed invoices to the Plan Administrator or the Litigation Trustee, as applicable, for all fees and expenses for which the Distribution Agents seek reimbursement, and the Plan Administrator or the Litigation Trustee, as applicable, shall pay those amounts that it, in its sole discretion, deems reasonable, and shall object in writing to those fees and expenses, if any, that the Plan Administrator or the Litigation Trustee, as applicable, deems to be unreasonable. In the event that the Plan Administrator or the Litigation Trustee, as applicable, objects to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Plan Administrator or the Litigation Trustee, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Plan Administrator or the Litigation Trustee, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

### 5. *Fractional and De Minimis Distributions*

Notwithstanding anything in the Plan to the contrary, the Plan Administrator or the Litigation Trustee, as applicable, and the Distribution Agent shall not be required to make Distributions or payments of less than $50.00, which amount shall be set forth in the Plan Supplement (whether in Cash or otherwise).

### 6. *Undeliverable Distributions*

In the event that any Distribution to any Holder is returned as undeliverable, or no address for such Holder is found in the Debtors' records, no further Distribution to such Holder shall be made unless and until the Plan Administrator, the Litigation Trustee or the Distribution Agent is notified in writing of the then-current address of such Holder, at which time such Distribution shall be made to such Holder not less than 30 days thereafter. Undeliverable Distributions shall remain in the possession of the Plan Administrator, the Litigation Trustee or the Distribution Agent until such time as such Distribution becomes deliverable or such Distribution reverts to the Wind Down Estates or is canceled pursuant to Article 7.10 of the Plan, and shall not be supplemented with any interest, dividends or other accruals of any kind.

### 7. *Reversion*

Any Distribution under the Plan, including Distributions made by the Agents in accordance with Article 7.1 of the Plan, that is an Unclaimed Distribution for a period of six

months thereafter, shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the (i) Wind Down Estates as Plan Assets and all Claims other than General Unsecured Claims but including RBL Deficiency Claims and (ii) Litigation Trust with respect to Unclaimed Distributions on account of General Unsecured Claims other than RBL Deficiency Claims. Upon such revesting, the Claim of any Holder or its successors and assigns with respect to such property shall be canceled, discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable Distributions and Unclaimed Distributions shall apply with equal force to Distributions that are issued by the Plan Administrator, the Litigation Trustee or the Distribution Agent made pursuant to any indenture or Certificate, notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

Nothing contained in the Plan shall require the Plan Administrator or the Litigation Trustee to attempt to locate any Holder of an Allowed Claim whose Distribution is declared an undeliverable or Unclaimed Distribution.

8. *Surrender of Canceled Instruments or Securities*

Except as otherwise provided in the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent. Subject to the foregoing sentence, regardless of any actual surrender of a Certificate, the deemed surrender shall have the same effect as if its Holder had actually surrendered such Certificate (including the discharge of such Holder's Claim or Equity Interest pursuant to the Plan), and such Holder shall be deemed to have relinquished all rights, Claims and Equity Interests with respect to such Certificate. Notwithstanding the foregoing paragraph, Article 7.8 of the Plan shall not apply to any Claims reinstated pursuant to the terms of the Plan.

9. *Compliance with Tax Requirements and Allocations to Principal and Interest*

In connection with the Plan, to the extent applicable, the Debtors, the Plan Administrator, the Litigation Trustee and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any tax law, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Plan Administrator, the Litigation Trustee and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the Distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms they believe are reasonable and appropriate. For purposes of the Plan, any withheld amount (or property) shall be treated as if paid to the applicable claimant. The Plan Administrator and the Litigation Trustee each reserves the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and

48

other spousal awards, liens and encumbrances. Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to trust fund-type taxes, then to other taxes and then to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that has accrued on such Claims.

10.   *Setoffs*

Except as otherwise provided in the Plan, a Final Order of the Bankruptcy Court, or as agreed to by the Holder and the Debtors, the Plan Administrator or the Litigation Trustee, as applicable, each Debtor or the Plan Administrator, as applicable, pursuant to the Bankruptcy Code (including section 553 thereof), applicable non-bankruptcy law, or such terms as may be agreed to by the Holder and the Debtors may, without any further notice to, or action, order or approval of the Bankruptcy Court, set off against any Allowed Claim and the Distributions to be made on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim), any claims, rights and Causes of Action of any nature that such Debtor or the Plan Administrator, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided* that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or the Plan Administrator of any such Claims, rights and Causes of Action that such Debtor or the Plan Administrator may possess against such Holder; *provided further* that any setoff against a Holder of an Allowed General Unsecured Claim must be with the consent of the Litigation Trustee, such consent not to be unreasonably withheld. In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of a Debtor or the Plan Administrator, as applicable, unless such Holder has filed a Proof of Claim in these Chapter 11 Cases by the applicable Claims Bar Date preserving such setoff and a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff.

11.   *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable law, or agreed to by the Plan Administrator no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date with respect to such Claim, notwithstanding any dispute or other delay with respect to any Distribution.

12.   *No Payment Over the Full Amount*

In no event shall a Holder of a Claim receive more than the full payment of such Claim. To the extent any Holder has received payment in full with respect to a Claim, such Claim shall be disallowed and expunged without an objection to such Claim having been filed and without any further notice to or action, order or approval of the Bankruptcy Court.

SC1:5119879.1

### D.     Settlement, Release, Injunction and Related Provisions

#### 1.     *Compromise and Settlement*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any Distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors and their Estates and is fair, equitable and reasonable.

#### 2.     *Subordinated Claims*

The allowance, classification and treatment of all Allowed Claims and Equity Interests and the respective Distributions and treatments under the Plan take into account, conform to and satisfy the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto; however, the Debtors reserve the right to reclassify or modify the treatment of any Allowed Claim or Equity Interest in accordance with any contractual, legal or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Equity Interest.

#### 3.     *Discharge of Claims and Termination of Equity Interests*

Pursuant to and to the fullest extent permitted by the Bankruptcy Code, except as otherwise specifically provided in the Plan or the Confirmation Order, the treatment of Claims and Equity Interests under the Plan shall be in full and final satisfaction, settlement, release, discharge, and termination, as of the Effective Date, of all Claims of any nature whatsoever, whether known or unknown, against, and Equity Interests in, the Debtors, any property of the Estates, the Plan Administrator or any property of the Wind Down Estates, including all Claims of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Equity Interest based upon such Claim, liability, obligation or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code or (c) the Holder of such a Claim, liability, obligation or Equity Interest has accepted the Plan.  Except as otherwise provided in the Plan, any default by the Debtors or their Affiliates with respect to any Claim that existed immediately prior to or on account of the filing of these Chapter 11 Cases shall be deemed cured on the Effective Date.

#### 4.     *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against

50

any property of the Estates shall be fully released and discharged, and all of the rights, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Wind Down Estates and their successors and assigns.

5.    _Debtor Release_

**Except as otherwise specifically provided in the Plan with respect to Preserved Potential Claims, for good and valuable consideration, including the service of the Released Parties to facilitate the administration of the Chapter 11 Cases and the implementation of the orderly liquidation contemplated by the Plan, on and after the Effective Date, the Released Parties are hereby released and discharged by the Debtors, the Plan Administrator and the Estates, including any successor to the Debtors or any Estate representative, from all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Plan Administrator or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the businesses of the Debtors, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors, the release or discharge of any mortgage, lien or security interest, the distribution of proceeds, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the administration of Claims and Equity Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted gross negligence, willful misconduct, fraud, or a criminal act; _provided_, _however_, the release under Article 10.5 of the Plan shall not apply to any Preserved Potential Claims to the extent such Preserved Potential Claims are brought by and for the benefit of the Litigation Trust with the approval of the Litigation Trustee.**

6.    _Voluntary Release by Holders of Claims and Equity Interests_

**For good and valuable consideration, including the service of the Released Parties to facilitate the administration of the Chapter 11 Cases, the implementation of the orderly liquidation contemplated by the Plan and the release of mortgages, liens and security interests on property of the Estates, the distribution of proceeds, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties**

51

**(regardless of whether a Releasing Party is a Released Party) shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Plan Administrator or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the businesses of the Debtors, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the administration of Claims and Equity Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted gross negligence, willful misconduct, fraud, or a criminal act. For the avoidance of doubt, nothing in Article 10.6 of the Plan will cause the release of Preserved Potential Claims that are otherwise transferred to, and may be prosecuted by, the Litigation Trust pursuant to the terms of this Plan.**

7. *Scope of Releases*

**Each Person providing releases under the Plan, including the Debtors, the Plan Administrator, the Estates and the Releasing Parties, shall be deemed to have granted the releases set forth in the Plan notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.**

8. *Exculpation*

**Notwithstanding anything in the Plan to the contrary, as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section**

1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation.

The Exculpated Parties shall neither have nor incur any liability arising on or after April 30, 2019 to any Entity for any act or omission in connection with these Chapter 11 Cases, including (a) the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; (b) the administration of Claims and Equity Interests during these Chapter 11 Cases; (c) formulating, negotiating, preparing, disseminating, implementing, administering, confirming and/or effecting the Disclosure Statement and the Plan, the Plan Supplement, and any related contract, instrument, release or other agreement or document created or entered into in connection therewith (including the solicitation of votes for the Plan and other actions taken in furtherance of Confirmation and Consummation of the Plan); (d) the offer and issuance of any securities under or in connection with the Plan or (e) the administration and adjudication of Claims, other than liability resulting from any act or omission that is determined by Final Order to have constituted gross negligence, willful misconduct, fraud or a criminal act.

9.    *Injunction*

Except as otherwise expressly provided in the Plan or Confirmation Order with respect to Preserved Potential Claims, the satisfaction, release and discharge pursuant to Article 10 of the Plan shall also act as a permanent injunction against any Person who has held, holds or may hold Claims, Equity Interests or Causes of Action against commencing or continuing any action, employment of process or act to collect, enforce, offset, recoup or recover any Claim, Equity Interest or Cause of Action satisfied, released, or discharged under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 and 1141 thereof.

10.    *Limitations on Exculpations and Releases*

Notwithstanding anything to the contrary in the Plan, none of the releases or exculpations set forth in the Plan shall operate to waive or release any obligation or Causes of Action of any Person or Entity:  (a) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan or documents, agreements or instruments executed in connection therewith, including all post Effective Date obligations or (b) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, including the Preserved Potential Claims.

11.    *Limitations on Recovery with Respect to Prepetition D&O Actions*

Any recovery by or on behalf of the Litigation Trust (and the beneficiaries thereof) on account of any Prepetition D&O Actions, including in each case by way of settlement or judgment, shall be limited to the Debtors' available D&O Policies' combined limits, after payment from such D&O Policies of the D&O Insurance Coverage.  No party, including the Litigation Trust, shall execute, garnish or otherwise attempt to collect on any settlement of or judgment in the Prepetition D&O Actions upon any assets of the Debtors'

SC1:5119879.1

current or former directors and officers on account of any Prepetition D&O Action except for actions by the Litigation Trust to the extent necessary to trigger the D&O Insurance Coverage. The restrictions and limitations set forth in the preceding three sentences shall be defined as the "**D&O Limitations**." In the event the D&O Insurance Coverage for any settlement or judgment in the Litigation Trust's favor is subject to denial as a result of the existence of any D&O Limitations, such D&O Limitations giving rise to the denial shall be null and void *ab initio* to the extent necessary to prevent the coverage denial.

> 12.    *Reservation of Rights*

The releases and exculpations provided by Articles 10.5, 10.6 and 10.8 of the Plan, the limitations on such releases and exculpation with respect to Preserved Potential Claims and any other provisions of this Plan are without prejudice to the rights of any Released Party under Sections 8.1 and 15.4 and the other provisions of the WSTR LLC Agreement and any similar provisions of the constitutive documents of any Debtor.

## 5.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the process of confirmation of the Plan. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

### A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing at which the Debtors will seek confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

**THE CONFIRMATION HEARING IS SCHEDULED TO BE HELD ON [•] AT [•]:00 A.M. (CENTRAL TIME), BEFORE THE HONORABLE JANICE D. LOYD, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF OKLAHOMA, 215 DEAN A. MCGEE AVENUE, SUITE 147, OKLAHOMA CITY, OKLAHOMA 73102. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN BY ANNOUNCEMENT IN OPEN COURT AND/OR NOTICE(S) OF ADJOURNMENT FILED ON THE DOCKET WITH THE BANKRUPTCY COURT'S PERMISSION.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE APPLICABLE PARTIES SO AS TO BE ACTUALLY RECEIVED ON OR BEFORE 4:00 P.M. (CENTRAL TIME) ON [•], IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### B.    Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find that the requirements of section 1129 of the Bankruptcy Code have been satisfied.  The Debtors believe that section 1129 has been satisfied because, among other things:

a.    the Plan complies with the applicable provisions of the Bankruptcy Code;

b.    the Debtors, as plan proponents, have complied with the applicable provisions of the Bankruptcy Code;

c.    the Plan has been proposed in good faith and not by any means forbidden by law;

d.    any payment made or promised under the Plan for services or for costs and expenses in or in connection with these chapter 11 cases, or in connection with the Plan and incident to these chapter 11 cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

e.    with respect to each Class of Impaired Claims or Equity Interests, each Holder of a Claim or Equity Interest in such Class has either accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code (see Section 5.C below – Best Interests Test);

f.    each Class of Claims or Equity Interests has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such class pursuant to section 1129(b) of the Bankruptcy Code;

g.    except to the extent that the Holder of a particular General Administrative Claim has agreed or will agree to a different treatment of such Claim, the Plan provides that Allowed General Administrative Claims will be paid in full in Cash on the Effective Date;

h.    except to the extent that a holder of an Allowed Other Priority Claim has agreed to a different treatment of such Claim, each such Holder shall receive Cash in an amount equal to the Allowed amount of such Claim, or treatment in any other manner so that such Claim shall otherwise be rendered Unimpaired, (a) on the Effective Date or as soon as reasonably practicable thereafter; (b) if an Other Priority Claim is Allowed after the Effective Date,

55

on the date such Other Priority Claim is Allowed or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court;

i.      at least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class.

j.      Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan (see Section 5.D below – Financial Feasibility) and

k.      all fees payable under section 1930 of title 28 of the United States Code will be paid as of the Effective Date of the Plan.

### C.    Best Interests Test

#### 1.    *Explanation of the Best Interests Test*

Pursuant to section 1129(a)(7) of the Bankruptcy Code, Confirmation of the Plan requires that, with respect to each Class of Impaired Claims or Equity Interests, each Holder of a Claim or Equity Interest in such Class either (a) accepts the Plan or (b) receives or retains under the Plan on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code (this latter clause is known as the "Best Interests Test").

To determine the probable distribution to Holders of Claims and Equity Interests in each Impaired Class if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation.

The Debtors' chapter 7 liquidation value would consist primarily of the unencumbered and unrestricted cash held by the Debtors at the time of the conversion to a chapter 7 liquidation, the proceeds resulting from the sale of the Debtors' remaining unencumbered assets and properties by a chapter 7 trustee and Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised or settled. The gross cash available for distribution would be reduced by the costs and expenses of the chapter 7 liquidation and any additional Administrative Claims that might arise as a result of the chapter 7 cases. Costs and expenses incurred as a result of the chapter 7 liquidation would include, among other things, the fees payable to a trustee in bankruptcy and the fees payable to attorneys and other professionals engaged by such trustee. Additional Administrative Claims could arise by reason of, among other things, the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of these chapter

11 cases.  Such Administrative Claims and any other Administrative Claims that might arise in a liquidation case or result from these chapter 11 cases, such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a chapter 7 liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and Administrative Claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the Plan.  If the hypothetical chapter 7 liquidation distribution to Holders of Claims or Equity Interests in any non-consenting Impaired Class is greater than the distributions to be received by such parties under the Plan, then the Plan is not in the best interests of the Holders of Claims or Equity Interests in such Impaired Class.

2.    *Liquidation Analysis of the Debtors*

Amounts that a Holder of Claims and Equity Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of their restructuring advisors, attached to this Disclosure Statement as Appendix C (the "Liquidation Analysis").

As described in the Liquidation Analysis, underlying this analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis.

The Liquidation Analysis was developed solely for purposes of the formulation and negotiation of the Plan and to enable Holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Equity Interests in, the Debtors or any of their affiliates.

Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner.  The Debtors do not intend and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events.  Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of actual future results.

In deciding whether to vote to accept or reject the Plan, Holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

3. *Application of the Best Interests Test to the Liquidation Analysis of the Debtors*

Notwithstanding the difficulties in quantifying with precision the recoveries to Holders of Claims and Equity Interests, the Debtors believe that, based on a comparison between the recoveries under the Plan and the Liquidation Analysis, the Debtors' proposed Plan satisfies the requirements of the Best Interests Test. As the following table indicates, non-consenting members of each Impaired Class will receive more (or no less) under the Plan than they would through a liquidation of the Debtors in a hypothetical chapter 7 case.

| CLASS | DESCRIPTION | ESTIMATED RECOVERY | |
|---|---|---|---|
| | | PLAN | LIQUIDATION |
| 1 | Other Priority Claims | 100% | [•] |
| 2 | Other Secured Claims | 100% | [•] |
| 3 | RBL Secured Claims | [•] | [•] |
| 4 | General Unsecured Claims | [•] | [•] |
| 5 | Equity Interests in Holdings | 0% | [•] |

Accordingly, the Debtors believe that the Plan will allow the realization of greater value for their respective Impaired Classes than a hypothetical liquidation.

**D. Financial Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation of the Plan, that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation or reorganization is contemplated by the Plan.

The ability to make the distributions described in the Plan does not depend on future earnings or operations of the Debtors, but only on the orderly wind down of the Debtors' remaining assets. Accordingly, the Debtors believe that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

**E. Acceptance by Impaired Classes**

Except as described in Section 5.F below, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan. A class of claims that is unimpaired under the plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Under section 1124 of the Bankruptcy Code, a class is impaired under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that actually vote to

accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance. Holders of claims who fail to vote are deemed neither to accept nor to reject the plan.

### F.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors. Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan will be confirmed in a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Equity Interests that is Impaired under, and has not accepted, the Plan. Pursuant to Article 4.5 of the Plan, the Debtors reserve the right to seek confirmation under section 1129(b) of the Bankruptcy Code if necessary.

#### 1.    *Unfair Discrimination*

The Plan does not "discriminate unfairly" for the purposes of section 1129 of the Bankruptcy Code if the Plan gives substantially equivalent treatment to each Class of equal rank; in determining whether a plan discriminates unfairly, courts take into account a number of factors, including the effect of applicable subordination agreements between parties.

#### 2.    *Fair and Equitable*

The condition that the Plan be fair and equitable includes the following requirements as applicable:

a.    with respect to a non-accepting Class of Secured Claims, that: (i) the Holders of such Secured Claims retain the Liens securing such Claims to the extent of the Allowed amount of the Secured Claims, whether the property subject to the liens is retained by the Debtors or transferred to another entity under the Plan and (ii) each Holder of a Secured Claim in the Class receive deferred cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date, at least equivalent to the value of such Secured Claim Holder's interest in the Debtors' property subject to the Liens.

b.    with respect to a non-accepting Class of General Unsecured Claims, that either: (i) the Plan provide that each Claim Holder in such Class receive or retain, on account of such Claim, property of a value, as of the Effective Date, equal to the Allowed amount of such Claim or (ii) no Holder of any Claim or Equity Interest that is junior to the Claims or Equity Interests of such Class receive or

retain any property under the Plan on account of such junior Claim or Equity Interest.

c.    with respect to a non-accepting Class of Equity Interests, that either:  (i) the Plan provide that each Holder of an Equity Interest in such Class receive or retain under the Plan, on account of such Equity Interest, property of a value, as of the Effective Date, equal to the greater of:  (1) the Allowed amount of any fixed liquidation preference to which such Holder is entitled; (2) any fixed redemption price to which such Holder is entitled or (3) the value of such Equity Interest or (ii) if the Class does not receive property in the amount required under (i), no Class of Equity Interests junior to the non-accepting Class receive a distribution under the Plan.

*3.    Confirmation of the Plan Pursuant to Section 1129(b)*

The Debtors may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class presumed to reject the Plan, and reserve the right to do so with respect to any other rejecting Class of Claims, and/or to modify the Plan. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation of the Plan by the acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Debtors submit that the Plan does not "discriminate unfairly" for the purposes of section 1129(b) of the Bankruptcy Code because all Classes of equal rank receive substantially equivalent treatment under the Plan.

The Debtors submit that the Plan is "fair and equitable" for the purposes of section 1129(b) of the Bankruptcy Code because, as set forth above and in the Plan, the Holders of Claims in Classes 1 and 2 are Unimpaired and therefore deemed to have accepted the Plan. The Holders of Claims in Classes 3 and 4 may not receive, and Holders of Equity Interests in Class 5 will not receive, a distribution equal to the Allowed amount of their Claims, but no Holders of Claims or Equity Interests junior to these Classes will receive a distribution under the Plan on account of such junior Claims or Equity Interests.

Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the Debtors are required to cram down.

## 6.    VOTING PROCEDURES

On February [•], 2020, the Bankruptcy Court entered an order, among other things, approving this Disclosure Statement, approving procedures for soliciting votes on the Plan, approving the form of the solicitation documents and various other notices, setting the voting record date, the Voting Deadline and the date of the Confirmation Hearing and

establishing the relevant objection deadlines and procedures associated with Confirmation of the Plan (the "<u>Solicitation Procedures Order</u>") [Doc. [•]].[7]

The Solicitation Procedures Order, a copy of which is attached hereto as <u>Appendix B</u>, should be read in conjunction with this Section 6 of this Disclosure Statement.

If you have any questions about:  (a) the procedures for voting your Claim or with respect to materials that you have received or (b) the amount of your Claim or Equity Interest, or wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement or other solicitation documents, please contact:

> White Star
> c/o Kurtzman Carson Consultants LLC
> 222 North Pacific Coast Highway, Suite 300
> El Segundo, CA 90245
> T: 888-753-1521
> <u>http://www.kccllc.net/whitestar</u>

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Bankruptcy Rule 3020(b)(2), it may make such a determination without receiving evidence if no objection is timely filed.

In particular, and as described in more detail below, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that:  (a) the Plan has been accepted by the requisite votes of all Classes of Impaired Claims unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes; (b) the Plan is "feasible," meaning there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan; and (c) the Plan is in the "best interests" of all Holders of Claims and Equity Interests, meaning that all such Holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan.  Thus, even if all classes of Impaired Claims accept the Plan by the requisite votes, the Bankruptcy Court must still make an independent finding that the Plan satisfies these requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the Holders of Claims against and Equity Interests in the Debtors.

UNLESS THE BALLOT BEING FURNISHED IS TIMELY RECEIVED BY THE NOTICE AND CLAIMS AGENT ON OR PRIOR TO [•] AT **8:00 P.M.** (CENTRAL TIME) TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED TO BE SUBMITTED WITH SUCH BALLOT, THE DEBTORS MAY REJECT SUCH BALLOT AS INVALID

---

[7]   Capitalized terms in this Section 6 not otherwise defined in this Disclosure Statement or the Plan shall have the meanings ascribed to them in the Solicitation Procedures Order.

AND, ACCORDINGLY, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN.  IN NO CASE SHOULD A BALLOT OR ANY OF THE CERTIFICATES BE DELIVERED TO THE DEBTORS OR ANY OF THEIR ADVISORS.

**THE LITIGATION TRUST CREATED PURSUANT TO THE PLAN AND THE LITIGATION TRUST AGREEMENT PROVIDES THAT, AT THE DIRECTION OF THE RBL AGENT, PREFERENTIAL TRANSFER CLAIMS ARISING UNDER SECTION 547 OF THE BANKRUPTCY CODE SHALL NOT BE PURSUED AGAINST ANY OF THE DEBTORS' VENDORS AND TRADE CREDITORS WHERE THE APPLICABLE VENDOR OR TRADE CREDITOR (A) DOES NOT VOTE TO REJECT THE PLAN AND (B) REFRAINS FROM FILING OR OTHERWISE ASSERTING WITH THE COURT A SUBSTANTIVE OBJECTION TO THE PLAN THAT IS NOT CONSENSUALLY WITHDRAWN BY NO LATER THAN THE COMMENCEMENT OF THE CONFIRMATION HEARING; *PROVIDED, HOWEVER,* A "SUBSTANTIVE OBJECTION" SHALL NOT INCLUDE ANY OBJECTION THAT RELATES SOLELY TO THE TREATMENT OF CLAIMS IN CLASS 2 OF THE PLAN.**

### A.    Parties-in-Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is deemed to have accepted the plan, and the plan proponent need not solicit such holder's vote.  Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a detailed description of the treatment of Claims and Equity Interests under the Plan, refer to Section 4 above—Summary of the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

### B.    Voluntary Releases under the Plan

The third-party release and injunction language in Article 10 of the Plan is described above in Section 4 of this Disclosure Statement.

**HOLDERS OF CLAIMS OR EQUITY INTERESTS WILL EITHER RECEIVE A BALLOT OR ELECTION FORM, IN EACH CASE, TO ALLOW SUCH HOLDER TO OPT OUT OF THE RELEASES CONTAINED IN SECTION 10.6 OF THE PLAN BY CLEARLY MARKING THE "OPT-OUT" BOX ON THE BALLOT PROVIDED TO SUCH HOLDER. ASSUMING SUCH BALLOT OR ELECTION FORM, AS APPLICABLE, IS TIMELY RECEIVED AND IN PROPER FORM, HOLDERS OF CLAIMS OR EQUITY INTERESTS WHO CHECK THE "OPT-OUT" BOX ON THE BALLOT OR ELECTION FORM WILL NOT BE RELEASING PARTIES FOR PURPOSES OF SECTION 10.6 OF THE PLAN.**

     **C.**    **Classes under the Plan**

        *1.*    *Voting Impaired Classes*

Classes 3 and 4 are Impaired under, and entitled to vote to accept or reject, the Plan.

        *2.*    *Unimpaired Classes of Claims*

Classes 1 and 2 are Unimpaired under the Plan and deemed under section 1126(f) of the Bankruptcy Code to have accepted the Plan.

        *3.*    *Non-Voting Impaired Classes*

Class 5 receive no distributions under the Plan and are deemed under section 1126(g) of the Bankruptcy Code to have rejected the Plan.

     **D.**    **Solicitation Packages for Voting Classes**

As set forth in the Solicitation Procedures Order, the Debtors will distribute or cause to be distributed, a solicitation package to each Holder of a Claim entitled to vote on the Plan (a "Solicitation Package"). The Solicitation Packages will contain:

    a.  a cover letter: (i) describing the contents of the Solicitation Package, the contents of the enclosed USB and instructions for obtaining hard copies of materials provided on USB, and (ii) informing the Holders of the Debtors' recommendation to accept the Plan;

    b.  a Confirmation Hearing notice;

    c.  a printed Ballot, together with a pre-addressed, postage prepaid return envelope for submitting such Ballot;

    d.  the Disclosure Statement (together with all exhibits thereto, including the Plan and all exhibits to the Plan) in electronic format on a USB;

    e.  the entered Solicitation Procedures Order (without exhibits) in electronic format on a USB and

f.    such other materials as the Bankruptcy Court may direct.

**E.    Solicitation Packages for Non-Voting Classes**

*1.    Unimpaired Classes of Claims Not Eligible to Vote*

Under section 1126(f) of the Bankruptcy Code, classes that are not impaired under a plan are deemed to accept the plan.  Classes 1 and 2 are Unimpaired under the Plan and deemed under section 1126(f) of the Bankruptcy Code to accept the Plan.  Their votes to accept or reject the Plan will not be solicited.  Pursuant to the Solicitation Procedures Order, these parties should only receive a notice of the Confirmation Hearing, a notice of non-voting status and an Election Form.

*2.    Classes of Equity Interests Not Eligible to Vote*

Under section 1126(g) of the Bankruptcy Code, classes that are not entitled to receive or retain property under a plan are deemed to reject.  Class 5 are not receiving any distributions under the Plan and under section 1126(g) are deemed to reject the Plan.  Their votes to accept or reject the Plan will not be solicited.  Pursuant to the Solicitation Procedures Order, these parties should only receive a notice of Confirmation Hearing, a notice of non-voting status and an Election Form.

**F.    Voting Procedures**

Ballots cast by Holders in Classes entitled to vote and Election Forms must be received by the Notice and Claims Agent by the Voting Deadline at the following address:

**If by First-Class Mail, Courier or Hand Delivery:**

White Star Ballot Processing
c/o Kurtzman Carson Consultants LLC
222 North Pacific Coast Highway, Suite 300
El Segundo, CA 90245

IF YOU HAVE ANY QUESTIONS ON THE VOTING PROCEDURES, PLEASE CALL THE NOTICE AND CLAIMS AGENT AT (866) 967-0670.

Ballots received after the Voting Deadline will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected.  The method of delivery of Ballots and Election Forms to be sent to the Notice and Claims Agent is at the election and risk of each Holder of a Claim or an Equity Interest.  Except as otherwise provided in the Plan, such delivery will be deemed made only when the original executed Ballot or Election Form is actually received by the Notice and Claims Agent.  In all cases, sufficient time should be allowed to ensure timely delivery.  Ballots must be signed and legible, and must be clearly marked to either accept or reject the Plan (but not both).  If a Ballot or Election Form is signed by a trustee, executor, administrator, guardian, attorney-in-fact, or other person acting in a fiduciary or representative capacity, such person must indicate such capacity when signing the Ballot.  Original executed Ballots and Election Forms are required.  Delivery of a Ballot or

SC1:5119879.1

Election Form to the Notice and Claims Agent by facsimile, e-mail or any other electronic means will not be accepted. No Ballot or Election Form should be sent to the Debtors or the Debtors' financial or legal advisors, agents or representatives (other than the Notice and Claims Agent), and if so sent, will not be counted.

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and those restrictions on modifications set forth in the Plan, the Debtors, or the Plan Administrator, as applicable, may alter, amend or modify the Plan, without additional disclosure pursuant to section 1125 of the Bankruptcy Code. If the Debtors make changes in the terms of the Plan materially adverse to any Holder of Claims or Equity Interests or if the Debtors waive a material condition to the effectiveness of the Plan described in Article 11 of the Plan, the Debtors will disseminate additional solicitation materials to such affected Class and will extend the solicitation period, in each case to the extent directed by the Bankruptcy Court. After the Confirmation Date and prior to substantial consummation of the Plan, the Debtors may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, this Disclosure Statement or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of the Plan.

## 7.    ADDITIONAL FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN OR ITS IMPLEMENTATION.

### A.    Risks Related to these Chapter 11 Cases

#### 1.    *General*

It is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. A delay in the bankruptcy proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### 2.    *The Debtors Will Be Subject to Risks and Uncertainties Associated With These Chapter 11 Cases*

For the duration of these chapter 11 cases, the Debtors' ability to operate, develop and execute a chapter 11 plan, will be subject to the risks and uncertainties associated with chapter 11. These risks include the following: (a) ability to develop, confirm and consummate

the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the chapter 11 cases from time to time; (c) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the chapter 11 cases to chapter 7 proceedings and (d) the actions and decisions of the Debtors' creditors and other third parties who have interests in these chapter 11 cases that may be inconsistent with the Debtors' plans.  Because of the risks and uncertainties associated with these chapter 11 cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during these chapter 11 cases that may be inconsistent with the Debtors' plans.

*3.*      *Undue Delay in Confirmation May Result in Additional Costs*

If confirmation and consummation of the Plan do not occur expeditiously, these chapter 11 cases could result in, among other things, increased costs for professional fees and similar expenses.

**B.     Risks Related to the Plan**

*1.*      *Holders of Claims and Equity Interests May Object to the Classification of Claims*

Section 1122 of the Bankruptcy Code requires that the Plan classify claims against, and interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests of such Class.  The Debtors believe that all Claims and Equity Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (a) to modify the Plan to provide for whatever classification might be required for Confirmation and (b) to use the acceptances received from any Holder of Claims or Equity Interests pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could materially adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this

solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

2.    *The Debtors May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation*

To satisfy the requirements of Bankruptcy Code section 1126(b) and Bankruptcy Rule 3018(b), the Debtors will be delivering the Solicitation Materials to all Holders of Claims as of the voting record date in the Classes entitled to vote. Accordingly, the Debtors believe that the solicitation is proper under section 1125 of the Bankruptcy Code. The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the Confirmation of the Plan could be denied. If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to re-solicit votes to accept or reject the Plan or to solicit votes from one or more Classes that were not previously solicited. The Debtors cannot provide any assurances that such a re-solicitation would be successful. Re-solicitation could delay or jeopardize confirmation of the Plan. Non-confirmation of the Plan could result in protracted chapter 11 cases.

3.    *Certain Creditors May Bring Litigation Against the Debtors*

Certain of the Debtors' creditors may bring litigation against the Debtors during the course of these chapter 11 cases, the outcome of which is uncertain. Although the Debtors believe the Plan satisfies all of the requirements necessary for Confirmation by the Bankruptcy Court, creditors and other parties-in-interest may bring objections to challenge Confirmation of the Plan.

4.    *The Bankruptcy Court May Not Grant the Debtors' Request for Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a Chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting class. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

5.    *The Results of an Actual Chapter 7 Liquidation May Be Different From the Liquidation Analysis*

Conversion to chapter 7 liquidation would, in the view of the Debtors, produce a less favorable outcome for Holders of Claims and Equity Interests than would the Plan.

However, underlying the Liquidation Analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis. Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or alternatively, may have been unanticipated.

6.    *Plan Releases May Not Be Approved*

There can be no assurance that the Plan releases, as provided in Article 10 of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan or the Plan not being confirmed.

7.    *The Plan May Not Be Confirmed*

The Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan. Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.

Even if the Bankruptcy Court determines that this Disclosure Statement and the balloting procedures and results are appropriate, the Bankruptcy Court may still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications will not necessitate the re-solicitation of votes. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Equity Interests would ultimately receive with respect to their Claims or Equity Interests in a subsequent plan of reorganization or liquidation.

8.    *The Plan May Not Become Effective*

Although the Debtors believe that the Effective Date of the Plan will occur soon after the Confirmation Date, there can be no assurance as to the occurrence of the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions precedent to the effectiveness of the Plan will be met or that the other conditions to consummation, if any, will be satisfied or sufficiently waived. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

9.    *The Amount of Available Distributions, If Any, May Vary*

While the Debtors have attempted to project what they believe are likely distributions, if any, to be made to parties holding Allowed Claims, there can be no certainty that the projections will be accurate and that Holders will receive the distributions described in the Plan. The projections will necessarily be affected by, among other things, recoveries generated in connection with the liquidation of all of the Debtors' remaining assets, the outcome of

SC1:5119879.1

objections to Claims, and the cost and expenses of such actions and generally administering and winding down the Debtors' Estates.

### C.    Additional Risks

#### 1.    *Claims Could Be More Than Projected*

There can be no assurance that the estimated Allowed amount of claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the assumptions underlying the projected recoveries discussed in this Disclosure Statement, and the variation may be material.

#### 2.    *The Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

#### 3.    *No Representations Outside this Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, these chapter 11 cases, once commenced, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

#### 4.    *Forward-Looking Statements Are Not Assured, and Actual Results May Vary*

This Disclosure Statement contains forward-looking statements.  These forward-looking statements include factors that could cause actual results to differ materially such as: those factors described in Section 7 of this Disclosure Statement; the Debtors' ability to obtain Bankruptcy Court approval with respect to motions in these chapter 11 cases; the effects of the Bankruptcy Court rulings in these chapter 11 cases and the outcome of the case in general; the length of time the Debtors will remain in these chapter 11 cases; the pursuit by the Debtors' various creditors, equity holders and other constituents of its interests in these chapter 11 cases; risks associated with third-party motions in these chapter 11 cases, which may interfere with the ability to consummate the Plan; the increased administrative and restructuring costs related to these chapter 11 cases; and the payments of Claims and the amount of expenses projected to recognize recoveries and reconcile such Claims.

5.       *No Legal or Tax Advice is Provided to You by This Disclosure Statement*

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of Claims and Equity Interests against the Debtors should consult his, her or its own legal counsel and accountants as to legal, tax and other matters concerning such Holder's Claims and Equity Interests. This Disclosure Statement is not legal advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

6.       *Governmental Laws, Regulations and Actions Could Adversely Affect the Debtors*

The Debtors are subject to various federal, state and local laws, orders and regulations. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal fines and penalties or the imposition of injunctive relief.

Future compliance with laws and regulations, including environmental, production, transportation, sales, rate and tax rules and regulations, and any changes to such laws or regulations, may reduce the Debtors' profitability and have a material adverse effect on their financial position, liquidity and cash flows. Such laws and regulations may require more stringent and costly measures.

7.       *No Admission Is Made*

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Equity Interests.

# 8.  MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Federal Income Tax Consequences to Debtors

A Holder of Claims or Equity Interests will generally be subject to United States federal income tax if such Holder is:

- a citizen or resident of the United States;

- a corporation organized under the laws of the United States or a state or subdivision thereof;

- an estate whose income is subject to United States federal income tax regardless of its source;

- a trust, if a United States court can exercise primary supervision over the trust's administration and one or more United States persons are authorized to control all substantial decisions of the trust;

70

- an individual present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met;

- a Holder in respect of which the gain is effectively connected with the Holder's conduct of a trade or business in the United States (or, if certain tax treaties apply, is attributable to a permanent establishment in the United States); or

- a partnership with an investor that falls into one of the above categories.

Any Holders that fall into one of these categories should consult their United States tax advisors concerning both the United States federal income tax consequences of the Plan and the potential application of relevant information reporting and backup withholding requirements.

In addition, Holders not otherwise subject to United States federal income tax that intend to participate in the Plan through United States intermediaries should consult a United States tax advisor with regard to the potential applicability of information reporting requirements.

The Litigation Trust, if established, is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, the liquidating trust beneficiaries are deemed to own the assets of the trust, and all of the trust's income and loss is taxed directly to the liquidating trust beneficiaries). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The Internal Revenue Service (the "IRS"), in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Litigation Trust will be structured to comply with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Plan Administrator and Holders of Allowed General Unsecured Claims) will be required to treat, for U.S. federal income tax purposes, the Litigation Trust as a grantor trust of which Holders of Allowed General Unsecured Claims are the owners and grantors. The following discussion assumes that the Litigation Trust will be so respected for U.S. federal income tax purposes. However, no opinion of counsel has been requested, and the Plan Administrator may or may not obtain a ruling from the IRS, concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of the Litigation Trust, the U.S. federal income tax consequences to the Litigation Trust could vary from those discussed herein (including the potential for imposition of tax on the net income of the Litigation Trust at the entity level, rather than at the level of Holders of Allowed General Unsecured Claims).

Subject to any receipt of definitive guidance from the IRS to the contrary, the Plan Administrator will treat the assets comprising the Unsecured Claim Pool Reserve for US federal income tax purposes as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, and will treat it consistently for state and local tax purposes to the extent

permitted by applicable law.  Accordingly, the Plan Administrator will in effect treat the Unsecured Claim Pool Reserve as a separate entity for US tax purposes, and this entity will be subject to tax on its net income at the entity level.  The Plan Administrator will in this regard cause the Wind Down Estate to file appropriate federal, state and local tax returns and pay tax accordingly out of the assets of the Unsecured Claim Pool Reserve, and such tax will be treated as reducing the amount that is distributable to Holders of Allowed General Unsecured Claims.

**B.    General Tax Reporting by the Litigation Trust and Litigation Trust Beneficiaries**

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Plan Administrator Holders of Allowed General Unsecured Claims) will treat the transfer of the assets to the Litigation Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Litigation Trust assets will be treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets (including any obligations to holders of Disputed Claims), directly to the Holders of Allowed General Unsecured Claims (with each Holder receiving an undivided interest in such assets in accordance with its economic interests in such assets), followed by the transfer by the Holders of such assets (subject to any obligations to holders of Disputed Claims) to the Litigation Trust.  Accordingly, all parties shall treat the Litigation Trust as a grantor trust of which the Holders of Allowed General Unsecured Claims are the owners and grantors, and treat such holders as the direct owners of an undivided interest in the Litigation Trust assets, consistent with their economic interests therein, for all U.S. federal income tax purposes.  The Litigation Trustee will not be in a position to provide guidance regarding the value of a Holder's allocable share of Litigation Trust assets after taking account of any associated obligations to holders of Disputed Claims, and Holders of Allowed General Unsecured Claims should consult their tax advisors regarding this point.  Holders are also urged to consult their tax advisor regarding any subsequent year's adjustments for the elimination of obligations to holders of Disputed Claims and their replacement with a smaller amount of Allowed Claims that are then paid out of the assets of the Litigation Trust.

Taxable income or loss allocated to a Holder of an Allowed General Unsecured Claims will be treated as income or loss with respect to such holder's undivided interest in the Litigation Trust assets, and not as income or loss with respect to its prior Allowed Claim.  The character of any income and the character and ability to use any loss will depend on the particular situation of the holder.

The U.S. federal income tax obligations of a U.S. holder with respect to its Litigation Trust beneficial interest are not dependent on the Litigation Trust distributing any cash or other proceeds.  Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the Litigation Trust's income even if the Litigation Trust does not make a concurrent distribution to the holder.  In general, a distribution of cash by the Litigation Trust will not be separately taxable to a Litigation Trust beneficiary since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Litigation Trust).

## 9.    ALTERNATIVE TO CONFIRMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims and Equity Interests the potential for the greatest recovery on those Claims and Equity Interests and is therefore in the best interests of such Holders.  If the Plan is not confirmed, the only alternative near-future outcomes for the Debtors is the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### A.    Chapter 7 Liquidation

If the Plan is not confirmed, these chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors.  It is impossible to predict with precision how the proceeds of the liquidation would be distributed among Holders of Claims against the Debtors.

The Debtors believe, however, that creditors would receive less value in the event that the Debtors are liquidated under chapter 7.  In addition, the Debtors believe that, in a liquidation under chapter 7, the value of the Debtors' estates will be substantially eroded before creditors receive any distribution, as a result of additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees.  The assets available for distribution to creditors will be reduced by such additional expenses and by claims, some of which will be entitled to priority.

The Liquidation Analysis, prepared by the Debtors with their restructuring advisors, is premised upon a hypothetical liquidation in a chapter 7 case.  In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate estimated realizable value of their assets, and the extent to which such assets are subject to liens and security interests.  The likely form of any liquidation would be the wind-down and sale of individual assets.

Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable under the Plan. Therefore, the Debtors submit that the projected recoveries available to Holders of Claims and Holders of Equity Interests in a chapter 7 liquidation are likely to be lower than those available under the Plan.

## 10.    DEBTORS' RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described herein.  **Therefore, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept it.**

SC1:5119879.1

Dated: January 6, 2020
Oklahoma City, Oklahoma

    Respectfully submitted,

**WHITE STAR PETROLEUM HOLDINGS, LLC**
**(for itself and on behalf of each of the Debtors)**

By: */s/ Jeffrey J. Zanotti*
      Name:  Jeffrey J. Zanotti
      Title:  Senior Vice President, General Counsel
      and Secretary

*/s/ John D. Dale*
John D. Dale, OBA No. 19787
GABLEGOTWALS
1100 ONEOK Plaza
100 West 5th Street
Tulsa, Oklahoma 74103-4217
Telephone: (918) 595-4800
Fax: (918) 595-4990
Email: jdale@gablelaw.com

-and-

*/s/ Craig M. Regens*
Craig M. Regens, OBA No. 22894
GABLEGOTWALS
One Leadership Square
211 North Robinson
Oklahoma City, Oklahoma  73102
Telephone:   (405) 568-3313
Facsimile:    (405) 235-2875
cregens@gablelaw.com

-and-

Andrew G. Dietderich, NY Bar 2850584
Brian D. Glueckstein, NY Bar 4227005
Alexa J. Kranzley, NY Bar 4707386
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:     (212) 558-4000
Facsimile:     (212) 558-3588
dietdericha@sullcrom.com

gluecksteinb@sullcrom.com
kranzleya@sullcrom.com

*Co-Counsel to the Debtors*

SC1:5119879.1

**<u>Appendix A</u>**

**Debtors' Plan of Liquidation**

# **Appendix B**

## **Solicitation Procedures Order**

**<u>Appendix C</u>**

**Liquidation Analysis**